Lawrence A. RUTH et al.

v.

Margaret P. CRANE.

Civ. A. No. 73-2707.

United States District Court,
E. D. Pennsylvania.

April 21, 1975.

Jean B. Green, Waters, Fleer, Cooper & Gallagher, Norristown, Pa., for plaintiff.

John V. Hasson, Timoney, Knox, Avrigian & Hasson, Ambler, for defendant.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

In this diversity action, the plaintiff is seeking specific performance of an agreement for the purchase of a thirteen acre parcel of land located in Plymouth Township, Montgomery County, Penn-sylvania. The action was tried to the Court without a jury, commencing on January 16, 1975. After carefully considering the evidence and the arguments presented by both sides, the Court has determined that it will grant specific performance.

The Court makes the following findings of fact and conclusions of law based on the evidence presented at the trial: The plaintiffs, Lawrence Ruth, Esq. and James Heffernen, Esq., both residents of Pennsylvania, were attorneys practicing law in Montgomery County, Pennsylvania. Although not law partners, Lawrence Ruth and James Heffernen occupied offices in the same suite and shared some expenses common to the running of the office. Sandy Towers Investors is a Pennsylvania limited partnership with four partners. Mr. Ruth and Mr. Heffernen are the general partners and Victor Montemayor and Richard Eberle are the limited partners. Margaret Crane, the defendant in this lawsuit, was a resident of the Commonwealth of Massachusetts at the time this action was instituted. She owned approximately thirteen acres of land located on Sandy Hill Road, Plymouth Township, Montgomery County, Pennsylvania.

The defendant, Margaret Crane, became the owner of the thirteen acres of real estate by virtue of two separate conveyances to her from her parents, George and Eva Phillips.[1] At the time of the second conveyance, Mrs. Crane agreed to execute a mortgage in favor of her parents, George and Eva Phillips. Upon her failure to execute the mortgage, her mother, Eva Phillips,[2] instituted a legal action in the Court of Common Pleas of Montgomery County, Pennsylvania, to compel the execution and delivery of the mortgage. On November 18, 1971, the defendant, Margaret Crane, entered into a settlement of

1. The two conveyances were dated March 14, 1963 and July 17, 1967, and the two deeds describing the realty conveyed are recorded in the Office of the Recorder of Deeds of Montgomery County, Pennsylvania, in Deed Book 3279, page 822, etc., and Deed Book 3520, page 216, etc., respectively.

2. George Phillips, the defendant's father, had died prior to the institution of suit by Eva Phillips.

the legal action and executed and delivered a mortgage to her mother, Eva Phillips, in the amount of $42,925.00, which amount included both principal and interest. The mortgage provides for monthly payments in accordance with a schedule attached thereto.

Mrs. Crane was employed as a secretary to the Honorable Richard Lowe when Mr. Lowe was the District Attorney for Montgomery County, and continued to work as his secretary for a short time after he became a Judge on the Court of Common Pleas of Montgomery County, Pennsylvania.[3] While she was employed by the District Attorney, she met Lawrence Ruth, Esq., who was then an Assistant District Attorney for Montgomery County. An attorney-client relationship first developed between Mr. Ruth and Mrs. Crane when Mr. Ruth prepared and filed Mrs. Crane's 1967 federal income tax return in 1968. Thereafter, Mr. Ruth continued to prepare Mrs. Crane's income tax returns and, in addition, represented her in a real estate assessment appeal and in the aforementioned legal action instituted by Mrs. Crane's mother.

There developed a close personal friendship between Mrs. Crane and Mr. Ruth and his family. In addition, Mr. Ruth purchased some real estate from Mrs. Crane's parents[4] adjoining the thirteen acres in question on which he is presently building a home. Mr. Ruth also rented a farmhouse located on the thirteen acres from Mrs. Crane, which farmhouse Mr. Ruth and his family are presently occupying awaiting the completion of their new home.[5]

In December of 1970, Mrs. Crane moved from Pennsylvania to Martha's Vineyard, Massachusetts and at that time she told Mr. Ruth that she was anxious to sell the thirteen acres and asked Mr. Ruth if he could find a purchaser. Mr. Ruth showed the property to several interested parties and received one offer in the summer of 1971 in the amount of $75,000.00. Mrs. Crane rejected the offer and advised Mr. Ruth that $75,000.00 was not sufficient in light of her belief that the property would be suitable for apartments and should bring a higher price.

In June of 1972, after she had moved to Massachusetts, Mrs. Crane contacted Mr. Ruth at his office and told him that she was experiencing financial problems brought on by the bankruptcy of the Penn Central Railroad, whose stock she owned and on which she had placed substantial dependence for her income. She explained that she was having difficulty meeting the mortgage payments to her mother and paying the real estate taxes on the thirteen acre tract. Mrs. Crane then offered to sell Mr. Ruth the thirteen acres for $85,000.00. She told him that he could assume the mortgage which she had given her mother and pay her 7% interest on the balance until her mother's mortgage was paid off, and then pay her equal monthly payments of interest and principal over a period of eight years, under a mortgage similar to the one which she had given her mother.

Mr. Ruth discussed Mrs. Crane's offer with his wife and decided that they were not in a financial position at that time to assume such an obligation. When Mr. Ruth informed Mrs. Crane of his decision, she told him that she would appreciate his looking for a purchaser for the thirteen acres. Mr. Ruth then spoke to Mr. Heffernen, with whom he shared offices, about the possibility of his helping to find a purchaser for the thirteen acres. Mr. Heffernen, who was familiar with the property, then interested three investors, Martin Bradley, Victor Monte-

3. Richard Lowe is presently a Judge of the Court of Common Pleas, Montgomery County, Pennsylvania.

4. The original suggestion to Mr. Ruth that he consider purchasing a lot from the defendant's parents came from Mrs. Crane.

5. The rental had advantages for both Mr. Ruth and Mrs. Crane. While Mr. Ruth received a favorable rental ($105.00 per month), Mrs. Crane had a friend take care of her interests in the property after she moved to Martha's Vineyard, Massachusetts.

mayor and Richard Eberle, who indicated their willingness to form a group to purchase the thirteen acre tract for the sum of $85,000.00 on the terms which had been offered to Mr. Ruth, i. e., make the payments to Mrs. Crane's mother due under the mortgage given to her by Mrs. Crane, pay interest on the balance at 7% until the mortgage was paid off, and then pay Mrs. Crane equal monthly payments of interest and principal over a period of eight years, and that the terms of the mortgage would be identical to the mortgage held by the mother.

On or about June 23, 1972, Mr. Ruth telephoned Mrs. Crane and informed her that a group of investors had agreed to purchase the thirteen acre tract for $85,000.00 on the terms heretofore discussed. Mr. Ruth also advised Mrs. Crane that both Mr. Heffernen and he would be members of the group and that the group of investors would meet the same conditions that she had offered to him. Mrs. Crane agreed and on June 26, 1972, Mr. Ruth sent an agreement of sale in letter form to Mrs. Crane.[6] The letter set forth the terms agreed upon during the telephone conversation.

Prior to her signing the agreement of sale, Mrs. Crane sent Mr. Ruth a letter questioning whether the sale included the corner lot at Sandy Hill and White Roads. Mr. Ruth telephoned her and stated that the others in the group took the position that it was "all or nothing". Mrs. Crane then suggested that perhaps she should retain her own attorney in connection with the transaction. Mr. Ruth replied that it would not hurt his feelings if she did so. Shortly thereafter, Mr. Ruth received the letter agreement of sale signed by Mrs. Crane. Commencing July 1, 1972, the plaintiffs

began to make the monthly interest payments required under the letter agreement of sale and also began making the monthly payments on the mortgage to Mrs. Crane's mother, Eva O. Phillips. Upon receipt of the 1972 real estate tax bills, Mrs. Crane calculated her share of the real estate taxes and sent to Mr. Ruth a check for $535.06. On August 29, 1972, Mr. Ruth mailed to the Treasurer of Plymouth Township, Montgomery County, Pennsylvania, Mrs. Crane's check and the purchaser's check for $874.14 in full payment of the tax bills which had been received.

Mr. Ruth then began preparing a mortgage and three deeds in order to complete the transaction in accordance with the letter agreement of sale. The letter agreement of sale provided that the release provisions of the mortgage would contain the same provisions as were in the mortgage Mrs. Crane gave to her mother.[7] The mortgage to Mrs. Crane's mother provided that in the event all or a portion of the thirteen acres was sold, the mortgagee was required to release the lien of the mortgage upon receipt of the cash value of the property to be released. In a discussion concerning this provision of the mortgage, Mrs. Crane stated that such a provision was not satisfactory to her because she wished to receive periodic payments for the full term of the mortgage. Mr. Ruth advised the defendant that the purchasers would agree to make the periodic payments with interest but that the mortgage should contain a release provision that would not require the purchasers to make a cash payment for any portion of the property which was later conveyed to a third person. She then agreed that such a provision should be written into the mortgage.[8] This

---

6. See Appendix A.

7. Paragraph 5 of the letter agreement of sale, Appendix A.

8. The provision in the proposed mortgage which was sent to Mrs. Crane for her signature reads as follows:

PROVIDED, HOWEVER, the Mortgagors shall not have the right to pay-off this Mortgage at any time other than the times and dates required herein; PROVIDED FURTHER, HOWEVER, the Mortgagee shall, upon request of the Mortgagors, release those portions of the mortgaged premises, that the Mortgagors

change was specifically noted in a letter of October 6, 1972, which Mr. Ruth sent to Mrs. Crane.[9]

On November 14, 1972, Mrs. Crane came to the office of Mr. Ruth and advised him that she had changed her mind and that she did not intend to convey the thirteen acres. Mr. Ruth replied that it was alright with him, but that he would have to check with the other investors. The other investors would not agree to call off the transaction and in a letter dated November 16, 1974, Mrs. Crane was so advised and she was again requested to execute the deeds and return the mortgage. Mrs. Crane did not do so, and this action seeking specific performance was filed.

At trial, both sides presented expert testimony as to the value of the thirteen acres as of July, 1972. Defendant's expert placed a value on the tract of land of $211,000.00, based on its use for garden apartments. However, the Court finds that the value of $95,000.00 which was placed on the thirteen acre tract by the plaintiffs' expert was the fair market value as of July, 1972. Most of the tract was (and is at present) zoned A residential. There is a small triangular section cut off from the main tract by high tension wires which was and is zoned B residential.[10] Neither A nor B residential zoning permit the building of either garden or high rise apartments. Both experts agreed that the highest and best use of this thirteen acres would

be for some sort of apartments although they were in complete disagreement as to the likelihood of a zoning change then or now which would permit such a use. The expert for the defendant arrived at his figure of $211,000.00 on the basis of his opinion that a change in the zoning of the thirteen acre tract to permit apartments could be obtained within a period of one year from July, 1972. On the basis of testimony by the plaintiffs' expert, we find that a zoning change at or about the time of this transaction, or in the reasonably foreseeable future, was unlikely and that the fair market value of the thirteen acres as of July, 1972 was $95,000.00, as testified by the plaintiffs' expert.[11]

### Attorney-Client Relationship

Defendant, Margaret Crane, contends that the plaintiffs' request for specific performance should be denied because an attorney-client relationship existed between herself and Lawrence Ruth and that Mr. Ruth, a principal in the group which entered into the agreement of sale with the defendant, took advantage of the relationship and influenced Mrs. Crane to enter into an agreement which was not in her best interest. The courts have set a high standard of fidelity which attorneys must meet when involved in purchasing property from their clients. In Kribbs v. Jackson, 387 Pa. 611, 129 A.2d 490 (1957), the Penn-

---

hereafter convey, from the lien of the mortgage, and also subordinate the lien of this mortgage to any construction mortgage, in the event the Mortgagors so request for the purpose of improvements: PROVIDED, FURTHER, HOWEVER, that the Mortgagors entire liability hereunder shall be limited to the premises described herein.

9. The letter provided in relevant part:
Pay particular note to the middle paragraph on page 6 because this contains your request that we not have the right to pay off the mortgage and guarantees you interest for the full term. By the same token, said paragraph also grants the right to the investors to sell or mortgage

the premises at any time upon your release. Also, it limits liability to the ground only, which is similar to the mortgage you gave your mother.

10. A 300-foot wide section of land directly under the high tension wires is owned in fee simple by the Philadelphia Electric Company and separates the two portions of the tract.

11. In addition to the presence of the high tension wires, several other circumstances made this subject property undesirable for development for single family dwellings. No access road existed to the interior portions of the tract of land and no sewer was readily available to the subject property, although on site sewage disposal might have been feasible.

sylvania Supreme Court stated at pages 621–622, 129 A.2d at page 496:

> That relation [attorney and client] is so confidential in its nature that it calls for the exercise of the most perfect good faith. In transactions between counsel and client, no shadow of anything like deception or unfair dealing upon the part of an attorney can be countenanced. In every case in which complaint is made, the courts will scrutinize the transaction with jealous care to see that there is no relaxation of the rule. Owing to the confidence bestowed upon him, the attorney is presumed to be able to strongly influence his client, hence, the law often declares transactions between them void, which between other persons would be unobjectionable. Unless the transaction is fair and conscionable, it is deemed a constructive fraud.

In Points v. Gibboney, 340 Pa. 522, 17 A.2d 365 (1941), the Supreme Court of Pennsylvania stated:

> The burden is upon him as attorney, to show that he did not gain a personal advantage by misrepresenting the legal situation or by failing to make it plain to those whom it was his duty to advise and protect.

Again, in Meara v. Hewitt, 455 Pa. 132, 314 A.2d 263 (1974), the Pennsylvania Supreme Court held that:

> [T]he burden should have been placed upon [the attorney] to prove that he did not abuse that relationship, that he fully disclosed the facts of the transaction to his client, and that the transaction was fair and conscionable.

We have determined that the plaintiffs here have met this heavy burden and have established by a preponderance of the evidence that the transaction was fair and conscionable and that there was no "overreaching".

■ The defendant has pointed to different areas in which she alleges that the handling of the transaction by Mr. Ruth was questionable. She first contends that the price of $85,000.00 for the real estate was so low as to be unconscionable and that Mr. Ruth, who was her attorney, encouraged her to sell at that price by representing that there was little hope for a zoning change when he had knowledge to the contrary. We have heretofore determined that the fair market value of the defendant's tract as of July, 1972, was $95,000.00 and that the chance of an immediate change of zoning was remote. Furthermore, Mr. Ruth at no point negotiated with the defendant for any price other than the $85,000.00 purchase price which was the figure which she demanded. The purchase price of $85,000.00 is not so disproportionate to the fair market value of $95,000.00, as to make the contract unconscionable or to indicate that Mr. Ruth abused the confidence placed in him by the defendant.

■ The defendant also argues strenuously that the mortgage which the defendant gave to her mother in the amount of $41,875.00, which was assumed by the plaintiffs and which was part of the $85,000.00 purchase price, was interest free to the plaintiffs and that this provision is unconscionable and tends to establish overreaching on the part of Mr. Ruth. Plaintiffs contend, however, that since interest was admittedly calculated in the monthly payments due by Mrs. Crane to her mother, they were indeed paying interest on that portion of the purchase price. No matter how one characterizes the mortgage assumed by the plaintiffs, we cannot find that the agreement was unconscionable or unfair. Indeed, it was the defendant, Mrs. Crane, who made the proposition that the purchasers should assume her obligation to her mother as provided in the then existing mortgage.

■ The defendant also contends that the fact that no personal obligation was assumed by the purchasers renders the transaction unconscionable. Again, we point out, however, that it was Mrs. Crane who suggested that the mortgage should contain the same provisions as

the mortgage which she gave mother. Furthermore, the record shows clearly that it was explained to Mrs. Crane that the purchasers were not assuming any personal liability in connection with the sale. It was understood that the mortgage would protect Mrs. Crane by giving her a lien on the property and by providing for a pro rata payment to her for any portion of the property sold by the purchasers prior to full payment of the purchase price. It was only after the defendant insisted that she wanted no pro rata release payment, but desired to receive equal monthly installments throughout the entire period of the mortgage, that Mr. Ruth substituted the provision in the mortgage requiring a release by the defendant of her lien on the land in the event the plaintiffs sold a portion of the thirteen acres.

■ In respect to the other contentions made by the defendant regarding the unconscionability of the agreement of sale, we find that terms were not in any manner unfair or unreasonable and that there was no overreaching by Mr. Ruth. The 7% annual interest rate was a fair one as of June, 1972. The fact that no independent appraisal was made prior to the fixing of the purchase price for the land does not have significance in light of our finding that the purchase price was fair and was the price set by the defendant. Furthermore, the fact that the agreement did not provide for a down payment on the part of the plaintiffs conforms with the defendant's expressed desire to receive periodic payments over a prolonged period of time rather than receive lump sum payments.

This case is not one in which the defendant was particularly inexperienced or necessitous.[12] The defendant is an intelligent woman who has had experience in real estate transactions prior to the sale in question. She was involved in the purchase of the thirteen acre tract from her parents and had sold the home she had lived in with her husband prior to his death before moving to Martha's Vineyard, Massachusetts. The testimony revealed that the defendant also was engaged in a retail business while living in Martha's Vineyard. She had considerable experience as a legal secretary, though she was not specifically involved in real estate transactions. Finally, although the defendant desired to rid herself of the financial burdens of the thirteen acre tract, the testimony did not reveal that her financial situation was desperate or that she could be said to be necessitous.

■ In reviewing the agreement of sale entered into between the parties to this lawsuit, we are not passing on whether there has been a violation of the Code of Professional Responsibility as adopted by the Supreme Court of Pennsylvania.[13] The Court has merely determined that the transaction taken as a whole was fair and conscionable in light of the fact that one of the purchasers was the defendant's attorney. The law does not prohibit an attorney from purchasing real estate from his client, nor does it hold that a transaction between an attorney and his client must be unfavorable to the attorney. The cases hold only that the attorney has the burden to demonstrate that the transaction is fair and conscionable and that he has not taken advantage of his client. After an exhaustive scrutiny of this transaction, we have determined that the plaintiffs have met their burden.

■ However, the Court has determined that it has a duty when presented with conduct of an attorney which may violate the stringent requirements set forth in the Code of Professional Responsibility to report the possible violation. In the instant transaction, Mr.

---

12. See L. Patterson and E. Cheatham, The Profession of Law, 262 (1971).

13. Supreme Court Rules Docket No. 1, Page 10; 438 Pa. XXV (1970). In February of 1974, the Pennsylvania Legislature adopted the Code of Professional Responsibility as the standard for attorneys of all the courts of the Commonwealth. Rule 205 of the Rules of Civil Procedure.

Ruth was involved in business dealings with his client, Mrs. Crane. The Code of Professional Responsibility has set forth explicit standards which must be met by an attorney when he finds himself in this situation. Ethical Consideration 5–3 provides in relevant part:

> After accepting employment, a lawyer should not acquire property rights that would adversely affect his professional judgment in the representation of his client. Even if the property interests of a lawyer do not presently interfere with the exercise of his independent judgment, but the likelihood of interference can reasonably be foreseen by him, a lawyer should explain the situation to his client and should decline employment or withdraw unless the client consents to the continuance of the relationship after full disclosure. A lawyer should not seek to persuade his client to permit him to invest in an undertaking of his client nor make improper use of his professional relationship to influence his client to invest in an enterprise in which the lawyer is interested.

Disciplinary Rule 5–104(A) provides further:

> A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

The Court has determined that the contract which was entered into between the plaintiffs and Mrs. Crane was in all respects fair and conscionable. Although it appears to this Court that Mr. Ruth's primary motivation in this transaction was to benefit his client, the conduct of Mr. Ruth as the attorney for Mrs. Crane does present a question as to whether Mr. Ruth met the standards of conduct required by the Code of Professional Responsibility. It is for this reason that we 'are forwarding a copy of this Memorandum and Order to the Disciplinary Board of the Supreme Court of Pennsylvania for such action, if any, as that Board deems appropriate.

*Statute of Frauds*

The defendant contends that the letter agreement of sale does not meet the requirements of the Pennsylvania Statute of Frauds, 33 P.S. § 1, and that an agreement for the sale of real estate cannot be specifically enforced unless the requirements of that statute are met. Polka v. May, 383 Pa. 80, 118 A.2d 154 (1955). The requirements of the Pennsylvania Statute of Frauds are met if there exists a memorandum in writing sufficient to evidence an agreement of sale and the writing is signed by the party creating the interest in the land. In Re Estate of Beeruk, 429 Pa. 415, 241 A.2d 755 (1968). The writing must contain a sufficient description of the real estate to permit its identification, Suchan v. Swope, 357 Pa. 16, 53 A.2d 116 (1947), and must contain the agreed terms of the sale. In Re Estate of Beeruk, *supra*. The Court has determined that the letter agreement of sale which was signed by the defendant sufficiently sets forth the terms of the sale and that the description of the land is sufficient to permit its identification. The defendant, Mrs. Crane, the title holder of the real estate, admitted that the letter agreement referred to the thirteen acre tract owned by her in Plymouth Township. Suchan v. Swope, *supra*. This record is clear that there is no question as to the land covered by the agreement. Furthermore, the writing is signed by Mrs. Crane, the party conveying the interest in the land, as is required by the statute. DiBennedetto v. DiRocco, 372 Pa. 302, 93 A.2d 474 (1953). Therefore, the requirements of the statute of frauds are met.

Defendant contends, however, that even though she signed the letter agreement of sale and the memorandum is otherwise sufficient to satisfy the requirements of the statute of frauds, the agreement cannot be specifically enforced against her because she could not obtain specific performance of the agreement against the plaintiffs be-

cause they did not sign the letter agreement. To entitle a party to a decree of specific performance, the contract must be mutual and both parties must have the right to compel specific performance. Gogel v. Blazofsky, 187 Pa.Super. 32, 142 A.2d 313 (1958). However, as previously stated, under Pennsylvania law, only the signature of the seller is required. A contract for the sale of land can be specifically enforced even though the buyer has not signed the agreement or its agent's authorization is not in writing. Tripp v. Bishop, 56 Pa. 424 (1867). Furthermore, the evidence in this record clearly shows that the agreement was signed by Mr. Ruth on behalf of the purchasers. The defendant, therefore, would not have been precluded from obtaining specific performance.

*Lack of Consideration*

■ The defendant next contends that at the time the letter agreement of sale was signed, and the contract entered into, Sandy Towers Investors was not in existence, and no one was bound to purchase the land owned by the defendant and, therefore, the agreement lacks consideration. It is true that the formal limited partnership agreement was not signed until July 13, 1972, and was not recorded until November 21, 1972, after the agreement of sale was executed by the defendant. However, the letter agreement signed by the defendant made no reference to Sandy Towers Investors or any Limited Partnership, but provided:

> This letter will serve as an Agreement of Sale. I believe the terms are in accord with our telephone conversation of June 23, 1972. *Jim Heffernen has assembled a group of investors, of whom both he and I are principals, who are willing to purchase the 13 acres (more or less) which you own on Sandy Hill Road, Plymouth Township, upon the following terms:* . . . (emphasis added) [14]

Therefore, when the defendant signed the letter agreement of sale, she agreed to enter a contract with Mr. Ruth, Mr. Heffernen, and a group of investors, and not with any entity known as Sandy Towers Investors. It is clear that the defendant could look to Mr. Ruth for performance of the contract, since he signed the agreement. It is further clear from the face of the letter agreement that the defendant also entered into the contract with Mr. Heffernen. The defendant did not at trial dispute the fact that Mr. Heffernen had authorized Mr. Ruth to act on his behalf, and Mr. Heffernen himself admitted that Mr. Ruth acted for him when he signed the agreement of sale. Furthermore, the record is clear that Mr. Ruth advised Mrs. Crane as to the identity of the other investors. Therefore, the defendant had recourse under the letter agreement of sale against those with whom she had contracted and the agreement lacks neither mutuality nor consideration.

■ Moreover, even if it could be fairly said that the defendant had entered into a contract with the partnership, and that she was entitled to look to the partnership for performance, the contract would not be defective for lack of mutuality or consideration because at the time the contract was entered into the partnership existed. Under Pennsylvania law, where parties intend to enter into a limited partnership, but fail to comply with the requirements of the Limited Partnership Act,[15] such as recording a proper certificate, the limited partnership is not formed, but the parties are treated as general partners as to third persons and creditors, and the partners' obligations and liabilities are found under the Pennsylvania Uniform Partnership Act.[16] Wisocki, Adm. v. Howell, 37 D.&.C.2d 667 (C. P. Franklin, 1965). Under the Pennsylvania Uniform Partnership Act, there is no requirement that a partnership agreement be in writing. Gohen v. Gravelle, 411

---

14. Letter Agreement of Sale—Appendix A.

15. 59 P.S. § 171 et seq.

16. 59 P.S. § 1 et seq.

Pa. 520, 192 A.2d 414 (1963). A partnership may be formed orally or may be found to exist by implication from the attending conduct and circumstances of the parties; that is, the manifestations of assent to the existence of a partnership relationship. Murphy v. Burke, 454 Pa. 391, 311 A.2d 904 (1973). Whether the parties are in fact partners inter sese is a matter of intention. Pappas v. Klutinoty, 383 Pa. 184, 118 A.2d 202 (1955).

*Remedy*

■ Pennsylvania law has generally held that a decree granting specific performance must conform to the contract being enforced and that a Court may not make a different contract for the parties. Giesecke v. Pittsburgh Hotels, 152 F.2d 689 (3d Cir. 1945); Philadelphia & Reading R. R. Co. v. Lehigh Coal and Navigation Co., 36 Pa. 204 (1860). In Himrod v. McFayden, 283 Pa. 103, 128 A. 733 (1925), the Pennsylvania Supreme Court held:

> Equity does not make contracts. It deals with those already made to prevent the intention of the parties from being frustrated by rigid rules of law or some mistakes of the parties. The decree must always conform to the precise contract; the court will not make one for them. (citations omitted).

With respect to the remedy of specific performance, the Restatement of Contracts § 359(2) provides:

> The decree need not be absolute in form, and the performance that it requires need not be identical with that promised in the contract; it may be so drawn as best to effectuate the purposes for which the contract was made, and it may be granted on such terms and conditions as justice requires.

Comment (b) of § 359, in explanation, states:

> The function of the court is to do complete justice; and it has power to mold its decree to that end. The mandatory order may be directed against the plaintiff, when properly requested,

as well as against the defendant; *it may be conditional upon some performance to be rendered by the plaintiff or by some third person, such as making money compensation for defects or the giving of security; it may even be conditional upon the plaintiff's assent to the modification of the contract that he seeks to enforce.* The flexibility in the form and the terms of the decree require a sound judicial discretion in every step in its drafting. (emphasis added)

Comment (c) provides:

> The rule stated in Subsection (2) shows that the court's power is not confined by narrow mechanical limits; but it also indicates that the power must be used only to effectuate the purposes of the contract. There is greater freedom in limiting the decree *by imposing conditions on enforcement than in varying the performance that is to be compelled.* (emphasis added)

■ The Pennsylvania Courts have not hesitated in appropriate circumstances to condition the granting of specific performance on some prior performance on the part of the plaintiff which was not called for in the original contract. See Field v. Golden Triangle Broadcasting, Inc., 451 Pa. 410, 305 A. 2d 689 (1973); Martinelli v. Dougherty, 4 D.&C.2d 315 (1955).

■ The Court has determined that this is an appropriate case to condition its grant of specific performance. Although we find that Lawrence Ruth has not overreached his client or abused the confidence placed in him by his client, there are two aspects of this transaction which must be specifically clarified in accordance with the intent of the parties as disclosed on this record. The plaintiffs must adequately secure their performance in connection with the release provisions of the mortgage before this Court will grant specific performance. The performance which the parties intended from this transaction was the continued payment of the equal mortgage payments to the defend-

ant for the entire period of the mortgage. The mortgage, therefore, must contain a provision that in the event the plaintiffs desire to sell all or a portion of the thirteen acre tract, they must set up an escrow account into which they will pay an amount sufficient to adequately secure to the defendant the balance of the equal monthly payments due under the mortgage. The plaintiffs testified that they have always been willing to adequately secure their performance under the mortgage by providing such release of lien provisions as would adequately secure the payments to the defendant over the entire period of the mortgage.

It was also testified that through inadvertence the real estate taxes were not correctly apportioned and that the purchasers have always been willing to correct this oversight. This mistake must be corrected by returning to Mrs. Crane any such overpayment of taxes with interest at 6% before the Court grants specific performance.

The Court is not rewriting a contract that the parties did not intend to make. We are simply conditioning our grant of specific performance upon the plaintiffs meeting these two conditions, which are essential elements of the contract as intended by the parties.

This Memorandum and Order is in lieu of findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Accordingly, the following Order is entered:

## ORDER

And now, this 21st day of April, 1975, specific performance is ordered and the defendant is directed to execute the deeds which have been prepared and to deliver said deeds to the plaintiffs, conditioned, however, upon the plaintiffs submitting to this Court for its approval, a mortgage, executed by them, which mortgage shall comply with the terms of the agreement of sale dated June 30, 1972 and, as discussed in this Memorandum, shall contain a release clause providing that in the event the mortgagors desire to sell a portion or all of the subject real estate prior to the termination of the mortgage period, the mortgagors shall place in an escrow account an amount sufficient to adequately secure to the defendant the balance of the equal monthly payments due under the mortgage and specific performance is further conditioned upon the plaintiffs returning to the defendant an amount equal to the overpayment of real estate taxes paid by the defendant plus interest at six percent (6%) which resulted from the incorrect apportionment of said taxes.

## APPENDIX A

LAWRENCE A. RUTH
ATTORNEY AT LAW

ARENA BUILDING
ONE STRAWBERRY PLACE
NORRISTOWN, PENNSYLVANIA 19401

TELEPHONE (215) 277-3463

June 26, 1972

Mrs. Margaret P. Crane
State Road
West Tisbury, Massachusetts

Re: Sandy Hill Road Property

Dear Margaret:

This letter will serve as an Agreement of Sale. I believe the terms are in accord with our telephone conversation of June 23, 1972. Jim

Heffernen has assembled a group of investors, of whom both he and I are principals, who are willing to purchase the 13 acres (more or less) which you own on Sandy Hill Road, Plymouth Township, upon the following terms:

1. The buyers will accept a deed from you and assume the existing mortgage to your mother, the present balance of which is $41,875.00.

2. The sale price shall be $35,000.00, for the house and one acre, and $50,000 for the remaining acreage, for a total of $85,000; you will accept a purchase money mortgage from the buyers for the difference between $85,000.00, and $41,875.00, or $43,125.00.

3. Between settlement and December 31, 1979, you will receive interest on your mortgage, but no principal, at the annual rate of 7%. Beginning on January 1, 1980, you will receive both principal and interest amortized in eight years.

    a. On this basis you will receive $3,018.75, per year in monthly installments. (Actually, you are getting more than 7% because you are receiving the interest in advance).

4. Beginning January 1, 1980, the $43,125 will be amortized for eight years at the annual interest of 7%, which will work out to 95 payments of $644.63 and a final payment of $769.63, at which time all principal and interest will be paid.

5. There shall be no personal liability on the mortgage, but the liability shall be limited to the ground only. This will be the identical mortgage you have with your mother, including release provisions.

6. Buyers will pay all transfer taxes, although it is customary that said taxes be borne equally by buyer and seller.

7. 1972 real estate taxes shall be apportioned equally between buyers and seller on a calendar year basis, with an agreed upon settlement date of July 1, 1972. This will require a payment by you one-half the real estate tax which you have advised me is $1,700.00, or $850.00. If you cannot make this payment, perhaps I can talk the investors into paying the entire amount and then reducing the mortgage accordingly. Please let me know because if this is done, the monthly figures I have given you will change slightly.

If these terms are agreeable to you, please sign the enclosed copy and return to me. Upon receipt of same I will prepare the mortgage and make the July 1 payment of $425.00 to your mother. You can expect to receive your first interest check for the month of July on August 1, 1972.

Very truly yours,

(s) Larry
LAWRENCE A. RUTH

LAR/kf

On this the 31st day of June, 1972, I hereby accept the above terms.

(s) Margaret P. Crane
Margaret P. Crane