In re Thomas R. GIBSON d/b/a The Miller Motel Company, Debtor.

Bankruptcy No. 85–08266.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division—Flint.

Dec. 17, 1986.

Sander H. Simen, Flint, Mich., for debtor.

Kittredge R. Klapp, Flint, Mich., for NBD Mortgage Company.

## MEMORANDUM OPINION DENYING MOTION OF NBD MORTGAGE COMPANY TO STRIKE ASSETS FROM SCHEDULES

ARTHUR J. SPECTOR, Bankruptcy Judge.

The question is this: may a limited partnership be dissolved and terminated and the business continued by the lone remaining partner, by individually settling with the limited partners and not by liquidating the assets of the partnership? The facts of this case are not in dispute.

On April 1, 1972, a limited partnership, called The Miller Motel Company, was created, consisting of Thomas R. Gibson, the general partner, and Russell and Josephine Gibson, Thomas Gibson's parents, the limited partners. The partnership was duly formed according to law and accorded a 25% interest to each limited partner and a 50% interest to Thomas R. Gibson. The business of the partnership was the opera-

tion of a Best Western Motel in Flint, Michigan. The partnership was to run until December 31, 1972 and thereafter from year to year until terminated.[1] Although the partnership agreement provided for the continuation of the business upon certain contingencies, nothing therein explicitly authorized the continuation of the business upon the death or withdrawal of all the limited partners.

On September 27, 1976, NBD Mortgage Company's predecessor in interest (hereafter "NBD") loaned $1.1 million to The Miller Motel Company. Security for the loan was a mortgage on partnership real estate, the motel itself. Thereafter, the composition of the partnership began to change. In 1977, Russell Gibson died, leaving his 25% interest to his son, Thomas; as a result, Thomas had a 75% interest in the partnership. In February, 1980, Gibson traded assets he held individually in a McDonald's restaurant franchise to his stepmother, Josephine Gibson, in return for her 25% interest in the partnership. This act left Thomas R. Gibson as 100% owner of the partnership, the fact of which was contemporaneously communicated to NBD. However, no certificate of cancellation of the partnership was ever filed.

The Miller Motel Company defaulted in its mortgage obligations with NBD and so, on December 9, 1985, NBD had a sheriff sell the motel in foreclosure. NBD was also the purchaser of the property. One hour prior to the sale, however, Thomas R. Gibson, attempting to stave off the foreclosure, filed his individual petition for relief under Chapter 11 of the Bankruptcy Code.

NBD filed a "motion to strike assets"[2] from the debtor's schedules. The basis of NBD's motion was that the limited partnership was still in existence because it never wound up its business as required by Section 30 of the Uniform Partnership Act, Mich.Comp.Laws § 449.30; Mich.Stat.Ann. § 20.30; therefore the partnership continues to exist and the individual debtor's bankruptcy estate possessed only an interest in the partnership itself and not in its only asset, the motel property. It claims that for a winding up to have occurred, the assets of the partnership should have been sold and the proceeds distributed, first to creditors and only later to partnership interests. Since the property was never property of this estate, it argues, the automatic stay imposed by 11 U.S.C. § 362(a) never prevented the foreclosure sale, and so the sheriff's sale of the property to NBD is final and unavoidable in bankruptcy.[3] In essence, NBD says that when Mrs. Gibson decided to withdraw, she and her stepson were powerless to terminate the partnership by mere settlement of their accounts, but were required by law to first satisfy all creditors in cash, even if to do so would require liquidation of the assets of the business.

Although both parties argued its provisions, as all of the material events in this case occurred before its January 1, 1983 effective date, the Michigan Revised Uniform Limited Partnership Act, Mich.Comp. Laws § 449.1101 *et. seq.;* Mich.Stat.Ann. § 20.1101 *et. seq.,* is inapplicable here. This is despite the fact that § 1105(a) of the revised act states that it applies, with certain exceptions, to any "limited partnership in existence on the effective date of this act," because The Miller Motel Company as a limited partnership was not "in existence" on the effective date of the re-

---

1. Partnership agreement, ¶ 7.

2. A "motion to strike assets", of course, is a silly notion. What NBD really wants is a declaration that the Howard Johnson Motel property is not property of the debtor's estate. Therefore, it has requested that we force the debtor to manually remove the ink from Schedule B–1 which reads that such property is property of the estate.

3. We need not address the question of whether the filing of a petition for relief by a partner stays actions against partnership property because of the resolution of this case on a threshold issue. However, good authority does exist for such a proposition. *See In re Minton Group, Inc.,* 46 B.R. 222, 12 B.C.D. 811, 11 C.B.C.2d 1442 (S.D.N.Y.1985); *In re Fulton,* 43 B.R. 273 (Bankr.M.D.Tenn.1984); *In re Dreskse,* 25 B.R. 268, 7 C.B.C.2d 1239 (Bankr.E.D.Wis.1982).

vised act. Instead, the former Uniform Limited Partnership Act as adopted in Michigan, Mich.Comp.Laws § 449.201 *et. seq.*; Mich.Stat.Ann. § 20.51 *et.seq.* (hereafter the "ULPA"), applies. Moreover, the Uniform Partnership Act, Mich.Comp.Laws § 449.1 *et. seq.*; Mich.Stat.Ann. § 20.1 *et. seq.* (hereafter the "UPA"), applies "to limited partnerships except in so far as the statutes relating to such partnerships are inconsistent" therewith. UPA § 6(2).

Because a limited partnership is defined in § 1 of the ULPA as "a partnership formed by 2 or more persons ... having as members 1 or more general partners and 1 or more limited partners....", when Mrs. Gibson withdrew in 1980, after her husband's death, the partnership was dissolved as a matter of law, something which both parties concede.

■ As properly noted by NBD, though, dissolution of a limited partnership does not terminate it; instead, the limited partnership continues to exist for the purpose of winding up its affairs. UPA § 30.[4] However, it goes further, arguing that "in order to wind up the partnership, the creditors would first have to be paid," citing for this proposition the UPA § 40. NBD's Brief in Support of Motion, p. 5.

Section 40 of the UPA, in pertinent part, reads as follows:

In settling accounts between the partners after dissolution, the following rules shall be observed, *subject to any agreement to the contrary*:

(a) The assets of the partnership are

(I) The partnership property,

(II) The contributions of the partners necessary for the payment of all the liabilities specified in clause b of this paragraph;

(b) The liabilities of the partnership shall rank in order of payment, as follows:

(I) Those owing to creditors other than partners,

(II) Those owing to partners other than for capital and profits,

(III) Those owing to partners in respect of capital,

(IV) Those owing to partners in respect to profits;

(c) The assets shall be applied in the order of their declaration in clause a of this paragraph to the satisfaction of the liabilities; ...

(Emphasis added). Two important things must be said about § 40 of the Uniform Partnership Act. First, § 40(b) would apply only if the partnership were to be discontinued and liquidated, for if the partners agreed otherwise, (something the preamble to the section clearly contemplates), no need for "payment" exists. Thus, where, as here, the withdrawing partner has agreed with the remaining partners to a winding up different from the rules set out in the statute, the rules in § 40 are inapplicable, and the business can be continued. *In re Streck's Estate*, 35 Ill.App.2d 473, 183 N.E.2d 26 (1962); *Medd v. Medd*, 291 N.W.2d 29 (Iowa 1980); *Gibson v. Deuth*, 270 N.W.2d 632, 635 (Iowa 1978); *Gianakos v. Magiros*, 238 Md. 178, 208 A.2d 718 (1965); *Maras v. Stilinovich*, 268 N.W.2d 541 (Minn.1978); *Wallner v. Schmitz*, 239 Minn. 93, 57 N.W.2d 821 (1953); *M. & C. Creditors Corp. v. Pratt*, 172 Misc.2d 695, 17 N.Y.S.2d 240 (1938); *Lonning v. Kurtz*, 291 N.W.2d 438 (N.D. 1980); *Wathen v. Brown*, 200 Pa.Super. 620, 189 A.2d 900 (1963); *Cauble v. Handler*, 503 S.W.2d 362, 366 (Tex.Civ.App. 1973); *Stroh v. Dumas*, 117 Vt. 13, 84 A.2d 408 (1951); *In re Trust Estate of Schaefer*, 91 Wis.2d 360, 283 N.W.2d 410 (1979).[5]

The second, and more obvious difficulty with applying § 40 of the UPA is that the ULPA has its own sections which control. Section 16 of the ULPA provides that a

---

**4.** This section states: "On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed."

**5.** As they are uniform acts, both the UPA and the ULPA are to be interpreted consistently from state to state. UPA § 4(4); ULPA § 28(2). Therefore caselaw authority from sister jurisdictions carry more weight than usual.

limited partner may receive from the general partner or out of the partnership property the return of his or her capital contribution if:

    (a) All liabilities of the partnership, except liabilities to general partners and to limited partners on account of their contributions have been paid *or there remains property of the partnership sufficient to pay them,*

    (b) The consent of all members ˙is had, unless the return of the contribution may be rightfully demanded under the provisions of paragraph (2), and

    (c) The certificate is cancelled or so amended as to set forth the withdrawal or reduction.

(Emphasis added). Thus the ULPA contemplates the payment of cash to a withdrawing limited partner so long as the other parties consent, the partnership is solvent notwithstanding the withdrawal of the capital and the certificate of limited partnership reflects the fact of the withdrawal.[6] Here, all prerequisites are met, except for the cancellation of the certificate.

Gibson claims, and NBD does not contest, that when Mrs. Gibson withdrew, there were sufficient assets in the partnership to pay all partnership liabilities.[7] Likewise, it is uncontested that all partners consented to her withdrawal and receipt of the payment from Mr. Gibson, the general partner. Of what effect then is the failure to cancel the certificate of limited partnership?

    ■ If the certificate is not executed by a person required to do so, a person desiring it may petition the appropriate circuit court to direct its cancellation. ULPA § 25(3). We assume that the purpose behind filing a certificate of cancellation is to provide notice that the limited partnership no longer exists, and could be for no one's benefit other than the former partners.[8] Although we are dubious of the proposition that an outsider has rights out of a partnership's failure to file a certificate of cancellation of limited partnership, we need

---

**6.** Section 24 of the ULPA also requires that the certificate of limited partnership which § 2 requires to be filed at the office of the county clerk of the county in which the principal place of business of the partnership is situated, "be cancelled when the partnership is dissolved or all limited partners cease to be such." Thus, the certificate of limited partnership should have been cancelled when Mrs. Gibson withdrew. Section 25(3) of the ULPA requires all of the members of the partnership to join in the execution of a certificate of cancellation of the limited partnership. This act never occurred in this case. However, we believe that our discussion of the similar requirement under § 16 is applicable to §§ 24, 25(3). *See infra.*

**7.** In Schedule A–2, the debtor claimed the value of the motel was $3,064,000, while NBD's mortgage thereon was only $884,000. He listed two other liens on the motel aggregating another $906,000, leaving in excess of $1 million equity in the motel.

**8.** If a limited partnership fails to file its certificate of limited partnership, the weight of authority is that the partnership exists but the limited partners are held liable to outsiders as general partners. *Heritage Hills v. Zion's First National Bank,* 601 F.2d 1023 (9th Cir.1979); *Mursor Builders, Inc. v. Crown Mountain Apt. Assoc.,* 467 F.Supp. 1316, 1331–1332 (D.V.I. 1978); *Ruth v. Crane,* 392 F.Supp. 724, 733

(E.D.Pa.1975). The purpose of the filing requirement is purely notice; outsiders should be aware that the company's owners other than the general partners, are not personally liable for the company's debts. *Brown v. Panish,* 99 Cal. App.3d 429, 160 Cal.Rptr. 282 (1979); *Hoefer v. Hall,* 75 N.M. 751, 411 P.2d 230 (1965); Op.Atty. Gen.1981, No. 5888, p. 147. We can find no authority explaining the purpose for the filing of a certificate of cancellation of the limited partnership. However, we surmise that its purpose is to protect a general partner from continuing liability arising from someone else's operation of a business under the dissolved partnership's name. We entertain doubt as to whether a pre-existing creditor of a limited partnership can ever complain of having been misled into believing it was still dealing with a limited partnership after the last limited partner has actually withdrawn. If it turns out that the partnership has indeed terminated, it would seem that the creditor would nonetheless have a cause of action against the continuing business, no matter what form of organization it has since adopted, as well as the general partners of the original partnership. Furthermore, if a corporation may be deemed such even though its articles of incorporation never get filed, under the doctrine of *"de facto corporation", see* 7 *Michigan Law & Practice,* Corporations § 45, perhaps a limited partnership can be *de facto* terminated without the filing of a certificate of cancellation.

not decide the question, for in this case, NBD clearly had notice that Gibson was acting as a sole proprietor for many years before the foreclosure was conducted.[9] It did not "rely" on the inaccurate state of the official record; consequently, NBD properly did not argue the non-filing of the certificate of cancellation. Thus, all three requirements for the payment by a general partner of the limited partners' contribution under the ULPA § 16 are met here.

Other sections of the UPA and the ULPA are also relevant. Section 20 of the ULPA provides that even the withdrawal of a general partner does not cause dissolution of the partnership if the remaining general partners, with the consent of all members, continue the business. Section 38(2)(b) of the UPA allows the remaining partners of a partnership wrongfully dissolved by one of the others to continue the business, on certain conditions. Section 41 of the UPA clearly permits the continuation of a partnership after dissolution upon the consent of the remaining parties. It provides certain protections for the firm's creditors, but nonetheless permits continuation of the business without a satisfaction of creditors' claims. *Also see* UPA §§ 42, 43.

NBD's reliance on the case of *Vanderplow v. Fredricks*, 321 Mich. 483, 32 N.W.2d 718 (1948), for the proposition that a winding up of a limited partnership is not complete until a liquidation occurs is misplaced. In that case, Vanderplow was the general partner, and Fredricks and Meyer were the limited partners. Despite the business' prosperity, the partners had a falling out and so they mutually agreed to dissolve the partnership. The following month, Vanderplow offered to settle with the others by tendering to them their respective equitable shares based on the book value of the assets. They refused the tender because it did not include their *pro rata* share of the goodwill, the increase in the value of the partnership real estate, or the post-dissolution profits of the business, which had been continued by Vanderplow as a sole proprietor. Vanderplow sued for an accounting and a determination of the parties' respective rights.

The Michigan Supreme Court held that until their accounts were settled—amicably or otherwise—the partnership entity continued, and any profits earned and capital appreciation realized were to be pro-rated according to the partners' respective shares. Therefore, not only were Fredricks and Meyer entitled to their capital and to shares of the pre-dissolution profits, they were also entitled to shares of the real estate's current market value, and the post-dissolution profits. Vanderplow was required to pay to each of the others one-third of the real estate's appreciated value or *alternatively* the real property was to be sold outright and the proceeds divided.

In *Vanderplow* the business was allowed to continue. Although the Supreme Court stated the black-letter law that a partnership dissolved is not terminated until a winding up takes place, the winding up that

---

**9.** At the trial on NBD's motion, Gibson testified that after assuming complete ownership of The Miller Motel Company, he ceased filing partnership tax returns. Also, the financial statement of Thomas Gibson and his wife, Ann, which they provided the bank in 1980, disclosed that the limited partnership no longer existed, while Schedule III thereof, a list of partnership and real estate holdings, indicated that they claimed a 100% interest in The Miller Motel Company. Further testimony established that the mortgagee had actual knowledge of all of the relevant facts prior to the mortgage foreclosure.

The parties exhibited confusion and ambiguity when referring to the status of The Miller Motel Company between 1980 and the eventual foreclosure. For example, although Mr. Gibson contemporaneously notified the bank of his ac-

quisition of all of the interests in the company, when an agreement extending the term of the mortgage was executed on November 5, 1984, the agreement nevertheless listed "Miller Motel Company, a Michigan limited partnership" as the mortgagor. Thomas Gibson signed it as "General Partner", but inexplicably, the bank caused his wife, Ann and he to sign it again in their individual capacities. Until then, Ann Gibson had never been a party to any contract regarding the motel. The only logical reason for requiring Mr. and Mrs. Thomas Gibson to sign the mortgage in their individual capacities was to protect the bank if, as we hold today, Mr. Gibson was then the sole owner of the motel and Ann Gibson, therefore, possessed a dower interest therein.

was ordered was a settlement of interests held by limited partners of the firm. The parties were *not* required to liquidate the business assets and to pay all creditors before paying the retiring partners' equitable shares.

NBD also relies upon *Commonwealth Capital Investment Corp. v. McElmurry,* 102 Mich.App. 536, 302 N.W.2d 222 (1980). In that case, the plaintiff sued MHS Enterprises, a Michigan co-partnership, and its general partners, of whom defendant was one. Default was taken against MHS, whereupon the plaintiff filed a motion for summary judgment against the defendant as a general partner of MHS. The motion was granted and defendant appealed. The basis of the appeal was that the partnership had been dissolved prior to the plaintiff's lawsuit, thus any judgment against the partnership was void; this, in turn, relieved the defendant of any liability as a general partner. The Court of Appeals disagreed. Although it had dissolved, pursuant to UPA § 30, the partnership was not terminated until its affairs had been wound up. Since MHS had never wound up its affairs, it was still an entity capable of suing or being sued in its own name. The judgment against MHS was not void and the defendant was still liable as a general partner. *Id.* at 539–541, 302 N.W.2d 222. From that NBD argues that until creditors are paid, the partnership continues to exist for purposes of being sued or having its property foreclosed.

We have no disagreement with the result in *Commonwealth.* General partners risk personal liability by the very nature of a general partnership association. Thomas Gibson also risked personal liability by being a general partner in The Miller Motel Company, a Michigan limited partnership. The difference in the cases is that in *Commonwealth,* the partnership was not wound up whereas in the present case, the partnership was wound up. The limited partnership relationship between Thomas Gibson and his parents was settled and wound up by virtue of the limited partners having their respective interests satisfied. Gibson was left as the sole owner of the business. Nevertheless, he was still potentially personally liable should the assets of the business fail to cover its debts. UPA §§ 36, 41(2). NBD never had any recourse against the limited partners as long as they stayed within the role of limited partners. ULPA § 7. Their liability was the extent of their capital contributions. Furthermore, if Thomas Gibson overpaid his father's estate or his stepmother for their interests, they were liable for the return of the price paid in case the partnership's capital thereby dipped below the amount necessary to satisfy claims of creditors. ULPA §§ 16, 17. Neither NBD, nor any other creditor was damaged by the lack of a liquidation.

*Commonwealth's* holding is simply that a general partner of a dissolved partnership is always on the hook for partnership obligations despite a dissolution. But that is not the issue in this case. If Gibson and his parents still presently ran the business as a limited partnership, dissolved it as a means toward ending the business, then claimed that a deficiency judgment for NBD on the mortgage was void due to the dissolution, we would agree that *Commonwealth* would control the case inasmuch as Gibson's liability as general partner was concerned. However, those simply are not the facts here. *Commonwealth,* then, does not stand for the proposition that withdrawing limited partners may not agree to the general partner's proposal for cashing out their equitable share of the net assets of the business, permitting him to continue the business of the former partnership without a liquidation and payment of creditors.

Although neither party cited it, *Wanderski v. Nowakowski,* 331 Mich. 202, 49 N.W.2d 139 (1951), supports our view. It was a suit by a former partner to determine the proper valuation of his partnership interest. At the end of the partnership agreement's term, the defendant sought to continue the business alone after paying off the plaintiff's interest in the firm. As in *Vanderplow,* a major portion of the opinion was devoted to determining

the value of the plaintiff's interest in the partnership. Of concern to us was the court's treatment of the right to continue the business following the dissolution of the partnership. The defendant was not required to liquidate the assets of the business, pay off creditors, then settle accounts between himself and the withdrawing partner. He was entitled to continue operations, provided that he paid the plaintiff the fair value of his interest in the partnership as of the date of dissolution. Despite the lack of any provision in the partnership agreement for the continuation of the business after a dissolution, the defendant was entitled to do so. In reaching this decision, the court cited *Vanderplow*, material provisions of the Uniform Partnership Act and case law in other jurisdictions. The court ordered that if the defendant failed to pay the plaintiff the fair value of his interest within a specified time, the plaintiff was to have at his option, compulsory process for enforcing the decree, or alternatively, the right to petition for the appointment of a receiver to take charge of the business and its assets, and to sell them under the direction of the court. At that time, either the plaintiff or the defendant could bid, but if no satisfactory offer was received, the assets of the partnership were (then and only then) to be offered publicly for sale and the proceeds used to satisfy the claims of creditors before any respective claims of the plaintiff and the defendant were settled. Clearly then, under Michigan case law, while a dissolution requires that a winding up occur, a liquidation of assets is only one of several alternative methods of accomplishing it.

Construing together pertinent provisions of the statute leads to the conclusion that it was not the intention of the legislature in the enactment of the uniform partnership act to impose a mandatory requirement that, under all circumstances, the assets of a dissolved partnership shall be sold and the money received therefor divided among those entitled to it. . . .

*Rinke v. Rinke*, 330 Mich. 615, 628, 48 N.W.2d 201 (1951) (dictum).

■ Reading the foregoing cases and various acts together, as we are bound to do, *Jones v. St. Louis-San Francisco Ry.*, 728 F.2d 257, 262 (6th Cir.1984); *Workman v. Detroit Auto. Inter-Insurance Exchange*, 404 Mich. 477, 507, 274 N.W.2d 373 (1979); *In re Bryant*, 323 Mich. 424, 437, 35 N.W.2d 371 (1949); *Grand Rapids v. Crocker*, 219 Mich. 178, 182–183, 189 N.W. 221 (1922), and after reviewing the cases from sister jurisdictions interpreting similar, if not identical statutes,[10] it is clear that it is contemplated under both acts that the business of a dissolved partnership may be continued by the remaining partner so long as the withdrawing partners accept a tender of their respective equity interests. There is simply no requirement that partners liquidate assets to pay creditors when the partners are otherwise satisfied. This is so because there is no sensible policy reason to require the liquidation, and hence, the sacrifice of a going concern when its owners are happy. J. Crane and A. Bromberg, *Law of Partnerships*, § 83A (West Publishing, 1968). Creditors are protected not only by their formidable array of independent remedies, but also by §§ 16 and 17(3), (4) of the ULPA,[11] which, generally, allow them to recover any distribution to a limited partner which has impaired the partnership's capital and the UPA § 41, which makes the entity which acquires the assets of a dissolved partnership subject to

---

10. See cases cited on p. 959; *supra*.

11. ULPA § 17 reads in pertinent part:

(3) The liabilities of a limited partner as set forth in this section can be waived or compromised only by the consent of all members; but a waiver or compromise shall not affect the right of a creditor of a partnership who extended credit or whose claim arose after the filing and before a cancellation or amend-

ment of the certificate, to enforce such liabilities.

(4) When a contributor has rightfully received the return in whole or in part of the capital of his contribution, he is nevertheless liable to the partnership for any sum, not in excess of such return with interest, necessary to discharge its liabilities to all creditors who extended credit or whose claims arose before such return.

964

partnership liabilities. *Id.* None of the Michigan partnership statutes provides a creditor with a right to compel a liquidation of a partnership's assets.[12] A right to compel a winding up is a right held by partners alone. Creditors have their own remedies in being able to sue on a debt, foreclose, etc.

█ It is our opinion that a limited partnership may be dissolved, wound up, terminated and the business continued by a remaining partner without liquidating the assets if the partners mutually agree on a fair settlement of their interests. We see no practical reason for holding otherwise. In support of our decision, we have examined not only case law, but have carefully read and examined the applicable statutes, trying to glean what we feel is the practical intent behind them. Part of the basis for our handling of the case was the obvious special nature of a limited partnership, which sets it apart from a general partnership, i.e., the former's resemblance in certain respects to a corporation.[13]

We find that The Miller Motel Company, a Michigan limited partnership, was dissolved, wound up and terminated, and the business properly continued by Thomas R. Gibson. The consequence of this is that Gibson's filing under Chapter 11 on December 9, 1985, triggered the protection of the automatic stay under 11 U.S.C. § 362(a) over the motel property. We therefore hold that NBD's motion to strike assets should be denied and determine that the foreclosure sale of December 9, 1985 is void as having been in violation of the automatic stay. An appropriate order shall be entered forthwith.

12. UPA § 37 states as follows:

Unless otherwise agreed, the *partners* who have not wrongfully dissolved the partnership or the legal representative of the last surviving partner, not bankrupt, has the right to wind up partnership affairs: provided, however, that any *partner,* his legal representative, or his assignee, upon cause shown, may obtain winding up by the court.

*Emphasis added.*

13. "Since public filing, limited liability and passive investors are features common to limited partnerships and corporations, it is not surprising that in some aspects of continuity, limited partnerships resemble corporations more closely than they do general partnerships". J. Crane and A. Bromberg, *Law of Partnership,* § 90B(a) (West Publishing, 1968); *see Jaffe v. Harris,* 109 Mich.App. 786, 793, 312 N.W.2d 381 (1981); *Bank of Bethesda v. Koch,* 44 Md.App. 350, 408 A.2d 767, 770 (1979).