BANK OF BETHESDA *v.* ROBERT F. KOCH ET AL.

[No. 288, September Term, 1979.]

*Decided December 7, 1979.*

The cause was argued before LOWE, MELVIN and MASON, JJ.

*Leonard M. Murphy* for appellant.

*Hyman Shapiro* for appellees.

LOWE, J., delivered the opinion of the Court.

In a letter "To Number 1365" declining once more to sanction a dramatization of "Tom Sawyer", Mark Twain once wrote of a fictitious experience as a western college professor, whereupon a Piute squaw intending to honor him named her baby for him, "a voluntary compliment" which pleased him greatly but brought about devastating and unforeseen consequences.[1] Such an honor the Bank of Bethesda seeks to have us bestow upon a statutory "Injun", legislatively referred to as a "charging order", which the Bank would have us redenominate a "judicial assignment".

Because a limited partner's interest in a partnership is declared by the Limited Partnership Act to be personal property, Md. Code, Corps. & Assns. Art., § 10-117, presumably in the nature of shares in a corporation, he has no rights in specific partnership property subject to attachment or execution. See also Uniform Partnership Act, Corps. & Assns. Art., § 9-502 (b) (3). To compensate for the protection of specific partnership property against claims by individual partner's creditors, both the Uniform Partnership Act, § 9-505, and the Limited Partnership Act, § 10-121, provide that a court may charge the interest of a debtor-partner in the partnership with payment of the unsatisfied amount of a judgment.

"§ 10-121. Rights of creditors of limited partner.

(a) On due application to a court of competent jurisdiction by any judgment creditor of a limited partner, the court *may charge the interest of the indebted limited partner with payment of the unsatisfied amount of the judgment debt;* and may appoint a receiver, and make all other orders, directions, and inquiries which the circumstances of the case may require.

(b) The interest may be redeemed with the separate property of any general partner, but may not be redeemed with partnership property.

(c) The remedies conferred by subsection (a) of

---

1. The letter, in pertinent part, is appended.

this section shall not be deemed exclusive of others which may exist.

(d) Nothing in this title shall be held to deprive a limited partner of his statutory exemption." (Emphasis added).

This remedy was sought and obtained by the Bank of Bethesda against Robert F. and Evelyn Carmen Koch who owed it $120,262.50. The Bank's problem is that although it had its judgment while Mr. Koch still owned some interest in the Holly Hills Associates Limited Partnership, his entire interest was assigned away before it obtained its charging order. Thus when it obtained an order that "the interests of Robert F. Koch in the Holly Hills Associates Limited Partnership be charged with the judgment debt of the Bank of Bethesda in the amount of $120,262.50 . . .'', Koch held no financial interest which would support the charging order.

Until April Fool's day in 1975, Robert F. Koch had owned a 22% interest in the Holly Hills Associates Limited Partnership. Along with his wife, Evelyn Carmen Koch, he was also indebted to the Bank of Bethesda upon a $130,000 confessed judgment note. Between April 1, 1975 and November 24, 1976, for adequate considerations, he assigned his interests in the limited partnership in varying proportions to Henry H. Vechery and James C. Broderick. Until the summer of 1976 when the partnership was notified about some of the assignments, none but the participants in those transactions knew of the assignments.

There should be noted here the distinction between an assignment of a limited partner's interest and a substitution of a limited partner. The distinction is implicit in § 10-118 of the Maryland Uniform Limited Partnership Act. That section makes it clear that a limited partner's interest is assignable, but unless he becomes a substituted limited partner "he is only entitled to receive the share of the profits or other compensation by way of income or the return of his contribution, to which his assignor would otherwise be entitled." § 10-118 (a) and (c). An assignee, to become a limited partner, must first obtain the consent of all of the other members of the limited partnership, unless the limited

partnership certificate authorizes substitution. However, in either case, the assignee will not secure the rights of a limited partner until the original certificate filed pursuant to § 10-102 is appropriately amended (pursuant to § 10-124) to indicate the substitution. § 10-118 (e).

Implicit is a significant feature of limited partnerships, *i.e.,* that a mere assignment of partnership interests need not be recorded nor notice given publicly or to anyone other than the participants. It is a transaction strictly between assignee and assignor, questionable by others only as to bona fides of the transaction if and when subsequently disclosed. It may very well be that it is this facility of concealment of fiduciary interests which makes limited partnerships so attractive to those who not only wish to limit their liability in investing, but prefer anonymity in doing so.

Secrecy was not necessarily sought in this case, however, but neither were the assignments publicized, perhaps because none of us desire to advertise financial adversity. Koch and his wife had become delinquent in paying the $120,262.50 balance on their note to the Bank, and on January 12, 1976, a judgment was confessed against them in the Bank's favor and, over a year and a half later on September 29, 1977, the Bank sought to satisfy its judgment by obtaining the charging order against what it thought was Koch's interest in the Holly Hills Associates Limited Partnership, and an order to sell that interest. But there was no such interest to sell and this first became apparent when Vechery and Broderick were permitted to intervene and move to set aside the charging order and the order to sell. Upon considering the recommendation of a special master, and after hearing the cause himself, Judge H. Ralph Miller, of the Circuit Court for Montgomery County, finding Koch had previously assigned his pecuniary interest in Holly Hills, vacated and set aside the order to charge and to sell the limited partnership interest of Koch to satisfy the Bank's judgment debt.

The initial questions raised by the Bank here are predicated upon our deciding "whether a statutory charging order ... is a form of judicial assignment or a form of attachment." Assuming we decide the former, the Bank then contends that

its "assignment" should be treated as a commercial transaction which would provide priority as to some of the actual assignments by reason of its prior notice (inappositely citing *Lambert v. Morgan,* 110 Md. 1 (1909)).

Neither alternative description is necessary nor particularly desirable. A § 10-121 charging order is nothing more than a legislative means of providing a creditor some means of getting at a debtor's ill-defined interest in a statutory bastard, surnamed "partnership", but corporately protecting participants by limiting their liability as are corporate shareholders. While limited partnerships were not created to assist creditors, but to enable persons to invest their money without being liable for partnership debts for more than their contribution, *Gilman Paint & Varnish Co. v. Legum,* 197 Md. 665, 670 (1951), neither were they intended to protect a partner's interest in the partnership against legitimate personal creditors. Since the statutory offspring is unique, the rights of creditors against partnerships were necessarily peculiar as well; hence, the charging order — which like the limited partner to which it applies — is neither fish nor fowl. It is neither an assignment nor an attachment. But, like many such questionable offspring, it resembles both progenitors in some of their characteristics.[2]

The order permitted by § 10-121 serves only the precise purpose statutorily indicated, *i.e.,* to "charge" an interest with a debt. Since appellant does not question the bona fides of the prior assignments, there was no interest in Holly Hills held by Koch to be "charged" with the debt. We decline

---

2. Appellant would also have us proclaim a charging order to be a judicial assignment because a revision of the Uniform Limited Partnership Act by the Uniform Law Commissioners provides that to the extent a court charges the partnership interest of a limited partner with payment of a judgment, the judgment creditor

*"has only the rights of an assignee of the partnership interest."*

Even if we agreed with appellant's interpretation from that proposed addition that such language provides a judgment creditor with all the rights of an assignee (which we do not), the Maryland Legislature has never seen fit *to adopt such change and we would certainly not impose upon an* unambiguous statute so drastic a policy consideration that it clearly does not by any of its language appear remotely to have intended.

appellant's invitation to expand a limited statutory right given creditors by judicial baptism with a pseudonym. We will not call that "Injun" somethin' it ain't.

The final question raised by the Bank contains a touch of irony. The Bank — which waited 20 months from the obtention of the judgment to ask for the charging order — now contends that Vechery and Broderick should not have been permitted to intervene because they did not do so within the same term of court that the charging order was obtained. To so argue, it now treats its charging order as "a form of attachment", and relies upon *McDowell, Pyle & Co. v. Hopfield,* 148 Md. 84 (1925) stating:

> "*McDowell Pyle* dealt with the issue of the priority between an assignee of accounts receivable who had not given notice to the debtor and a subsequent creditor of the assignor who attached the accounts receivable in the hands of the debtor. A judgment of condemnation absolute had been issued in favor of the creditor but on the last day of the same term of Court the prior assignee moved to intervene and to set aside the judgment. The Court found that if it had not been for the fact of the attachment, the prior assignee's assignment would have been valid and prior; but in its discussion of the case, the Court indicated that if the Motion to Intervene had not been timely filed, then the judgment of condemnation would have been absolute and given priority to the creditor. The Court went on to hold that because the motion was timely filed and because the assignment was specific to a particular asset while the creditor's lien was general, not looking to any particular asset, that it would find for the assignee over the creditor."

*McDowell,* even as so interpreted, is not apposite to this case. Assuming, without deciding, that a charging order is "a form of attachment" (and we did not so decide), a levy upon a judgment against Koch permits attachment only of Koch's property. By the time the charging order (attachment) was

obtained, Koch had sold *all* of his Holly Hills interest. As we have already indicated that there was nothing left for the order to "charge", so there is nothing to which the charging order could "attach". We fail to see how the interest of bona fide purchasers could be either attached or charged with the debt of another unless obtained after the order or in an effort to defraud before it was obtained.

Beyond that, we are not convinced that *McDowell* stands for the principle that intervention in the succeeding term of court would have precluded recovery by operation of law. Timeliness of intervention is to be determined from all circumstances in the exercise of the court's sound discretion. *Montgomery Co. v. Ian Corp.,* 282 Md. 459, 465 (1978). Nothing in the record extract indicates circumstantial untimeliness sufficient to warrant a finding that the court below abused its discretion.

> *Judgment affirmed.*
> *Costs to be paid by the appellant.*

APPENDIX:

"Twenty-four years ago, I was strangely handsome. The remains of it are still visible through the rifts of time. I was so handsome that human activities ceased as if spellbound when I came in view, and even inanimate things stopped to look — like locomotives, and district messenger boys and so-on. In San Francisco, in rainy season I was often mistaken for fair weather. Upon one occasion I was traveling in the Sonora region, and stopped for an hour's nooning, to rest my horse and myself. All the town came out to look. A Piute squaw named her baby for me, — a voluntary compliment which pleased me greatly.

Other attentions were paid me. Last of all arrived the president and faculty of Sonora University and offered me the post of Professor of Moral Culture and Dogmatic Humanities; which I accepted gratefully, and entered at once upon my duties. But my name had pleased the Indians, and in the deadly kindness of their hearts they went on naming their babies after me. I tried to stop it, but the Indians could

not understand why I should object to so manifest a compliment. The thing grew and grew and spread and spread and became exceedingly embarrassing. The University stood it a couple of years; but then for the sake of the college they felt obliged to call a halt, although I had the sympathy of the whole faculty.

The president himself said to me, 'I am as sorry as I can be for you, and would still hold out if there were any hope ahead; but you see how it is: there are a hundred and thirty-two of them already, and fourteen precincts to hear from. The circumstance has brought your name into most wide and unfortunate renown. It causes much comment — I believe that that is not an overstatement. Some of this comment is palliative, but some of it — by patrons at a distance, who only know the statistics without the explanation, — is offensive, and in some cases even violent. Nine students have been called home. The trustees of the college have been growing more and more uneasy all these last months — steadily along with the implacable increase in your census — and I will not conceal from you that more than once they have touched upon the expediency of a change in the Professorship of Moral Culture. The coarsely sarcastic editorial in yesterday's Alta, — headed Give the Moral Acrobat a Rest — has brought things to a crisis, and I am charged with the unpleasant duty of receiving your resignation.'

I know you only mean me a kindness, dear 1365, but it is a most deadly mistake. Please do not name your Injun for me. Truly yours."