763 A.2d 252

Carlton M. GREEN, Receiver,

v.

BELLERIVE CONDOMINIUMS LIMITED PARTNERSHIP.

No. 2149, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Nov. 3, 2000.

Reconsideration Denied Dec. 26, 2000.

**564**

Carlton M. Green (Samuel C. Steelman, Jr. and Green, Leitch & Steelman, on the brief), College Park, for appellant.

Monica M. Haley-Pierson (Knight, Manzi, Nussbaum & LaPlaca, P.A., on the brief), Upper Marlboro, for appellee.

Argued before MURPHY, Chief Judge, EYLER and ADKINS, JJ.

ADKINS, Judge.

In this appeal, we again consider the nature and extent of rights conferred by a charging order against a limited partnership interest. The new question presented by this case is whether a receiver with a charging order against limited partnership interests has a right to be notified of a partnership opportunity-in this case, an opportunity to purchase the partnership's debt. Affirming the trial court, we hold that general partners of a limited partnership do not have a duty to notify a charging creditor about that partnership opportunity, and that the charging creditor does not have standing to assert the debtor partners' management rights to participate in or object to such a purchase.

## FACTS AND BACKGROUND

In 1988, Arnold D. Wolfe co-founded Bellerive Condominiums Limited Partnership ("Bellerive" or the "Partnership"), appellee. A corporation controlled by Wolfe, U.S. Investment Group, Inc. ("USIG"), was one of Bellerive's three general partners. The other two general partners were Capital Management and Development Corporation ("Capital Management"), a Delaware corporation controlled by its president, Bechara Nammour, and Express Development Corporation, a New York corporation controlled by its president, Richard J. Seikaly.

Wolfe borrowed $50,000 from Richard C. Beavers and Richard P. Beavers, and contributed the funds to the Partnership. In turn, the Partnership used the funds to put a deposit on real property in Anne Arundel County. The Partnership's business plan was to develop and sell the property as condominiums.

As a result of the $50,000 capital contribution, Wolfe also became one of eight limited partners in Bellerive.[1] Under the terms of Bellerive's Partnership Agreement, as amended (the "Partnership Agreement"), Wolfe had priority to the first $50,000 in Partnership profits. Like Wolfe, Nammour and Seikaly also held both general and limited partnership interests through their business entities.[2]

To complete the purchase and develop the property, the Partnership borrowed from the National Bank of Washington ("NBW"). A $300,000 loan was evidenced by a September 24, 1988 note and deed of trust on the property (the "Loan," "Note," and "Deed of Trust"). The Loan was increased to $400,000 in November 1989. But the development plans did not proceed as the Bellerive partners had planned. The Partnership operated at a loss, despite capital calls and loans from its partners.

With no Partnership profits from which to pay the Beavers, Wolfe defaulted on his repayment obligation. In May 1991, the Beavers obtained a judgment against Wolfe and USIG, in

---

1. Wolfe made his initial capital contribution through Vector Holdings, Inc. ("Vector"), a company in which he had an ownership interest. As a result of the contribution, Vector held a 24% limited partnership interest in Bellerive. By 1989, however, Vector was indebted to the Partnership, apparently as a result of its failure to meet the Partnership's capital calls. Under the Partnership Agreement, Vector's partnership interest was diluted due to the debt. In May, 1990, Vector's Partnership interest, and its debt to the Partnership, were split among its three principals, including Wolfe, and assigned to them with the consent of the other partners. In an amendment to the Partnership Agreement, which was approved by all of the partners, Wolfe was assigned an 8% limited partnership interest in Bellerive, subject to the dilution provisions of the Partnership Agreement. Wolfe never satisfied his share of Vector's debt.

2. Nammour was president of Capital Management, which held a 1% interest as a general partner of the Partnership and served as Managing Partner. In addition, Nammour was president and controlling shareholder of Becnam Corp., which held an 11% interest as a limited partner of the Partnership, and vice-president of E.G.A. Properties, Inc., which also had an 11% interest as a limited partner. Seikaly was president of Express Development Corp., which owned both a 1% interest as a general partner and a 29% interest as a limited partner.

the amount of $124,040.74. Attorney Carlton M. Green, appellant, represented the Beavers in that action. In his collection efforts, Green became aware that Wolfe's priority right to Partnership profits might be used to satisfy the judgment, and that there might be profits if the Partnership's development and sale plans were successful. Green sought a charging order against Wolfe's interest as a limited partner and USIG's interest as a general partner. On October 28, 1993, the Circuit Court for Anne Arundel County entered a charging order (the "Charging Order") appointing Green as the receiver for any share of Partnership profits payable to either Wolfe or USIG, and for "any other money that is or becomes due to said judgment debtors by reason of their partnership interest." In November, the Partnership was advised of the Charging Order.

Meanwhile, unable to develop and sell the property as planned, the Partnership defaulted on the Note. At about the same time, NBW was dissolved, and the FDIC acquired the Note. By April 1994, the Loan balance exceeded $590,000. The FDIC scheduled a foreclosure sale for July 19, 1994.

Seeking to avoid foreclosure, Seikaly and Nammour negotiated with the FDIC to purchase the Note at a discount. The FDIC agreed to sell the Note for $375,000. On May 31, 1994, Seikaly and Nammour entered into an agreement to purchase the Note from the FDIC. The scheduled settlement date was July 15th. If settlement did not occur by July 19th, the FDIC planned to proceed with foreclosure scheduled for that date.

Seikaly and Nammour then invited all of the Bellerive partners to participate in the purchase of the Note. In a letter dated June 11, 1994, they informed the partners about the opportunity to purchase the Partnership's Note at a discount, and invited each partner to participate *pro rata* in the purchase. The letter specified the amount each partner would have to contribute, and included payment instructions. At the end of the letter, there were lines to indicate whether the partner "acknowledged, accepted and agreed" or "decline[d] the offer to purchase a share of the Note." The letter further

stated that if payment was not made by July 1, Messrs. Nammour and Seikaly "shall assume you choose not to participate in the Note purchase...."

By this time, neither Wolfe nor USIG was active in Partnership affairs. Seikaly testified that USIG "went out of business so they ceased to be a general partner." The notice letters for Wolfe and USIG were sent via certified mail to the most recent address specified for Partnership correspondence. But both letters were returned, marked "moved, not forwardable." No notice of the opportunity to purchase the Note was sent to the receiver.

The FDIC required the consent of the Partnership to the purchase and assignment of the Note. The partners other than Wolfe and USIG consented to the Note purchase. All but three of the partners participated in purchasing the Note at the discounted price.[3] With the Note and Deed of Trust now held in friendly hands, the Partnership continued efforts to develop and market the property. Those efforts included redesigning the development concept as townhomes, and re-marketing the property.

In January, April, and October, 1995, the receiver wrote to the Partnership's counsel to inquire about the status of the Partnership, but received no response. In June 1996, the receiver filed a complaint for dissolution of the Partnership. He alleged that it was not reasonable to carry on the business at a loss, and that Capital Management had acted unreasonably and had failed to account to the Partnership for any income or expenses. The purpose of the petition was to force a sale of the property and distribution of the proceeds in accordance with the Partnership Agreement. Shortly after filing the complaint, the receiver learned about the discounted Note purchase.[4] By Consent Order dated December 20, 1996,

---

3. We shall refer to the partners who participated in the Note purchase as the "Purchasing Partners."

4. The receiver testified that "[t]he first time I found out about [the discounted purchase] was August of 1996," but that he did not receive

the receiver agreed to stay his dissolution effort. in order to give the Partnership more time to sell the property.

In December 1997, the Partnership was able to sell the property under the redesigned development concept, at a contract price of $825,000. A Consent Order authorized the sale, but required escrow of $60,000 of the settlement proceeds pending judicial determination of the receiver's claims. On December 30, 1997, $676,374.45 of the settlement proceeds was used toward paying off the Note at its full face value, with none of the loan discount passed through to the Partnership. There was an additional balance due on the Note. As a result of the discount purchase, the sale of the property, and repayment of the Note three and a half years later, each of the Purchasing Partners benefitted.

After settlement, the receiver sought repayment of the $50,000 owed to Wolfe from the $60,000 in escrowed funds. He complained that the Purchasing Partners had breached their fiduciary duties by (1) failing to notify him of the opportunity to purchase the Note; and (2) failing to obtain the consent of Wolfe or USIG to the purchase. He asserted that because Wolfe and USIG had not consented to the Note purchase, the Purchasing Partners held any monies they made on the Note for the benefit of the Partnership. If the amount of the Loan discount were credited back to the Partnership, the receiver argued, there would be ample Partnership profit from which to make the priority repayment of Wolfe's $50,000.

After an evidentiary hearing, Judge Joseph P. Manck of the Circuit Court for Anne Arundel County rejected the receiver's contentions in a written Memorandum Opinion and Order dated June 18, 1998 (the "Order"). The court ruled *inter alia* that the receiver was not entitled to notice of the Note purchase, that the Purchasing Partners were not obligated to credit any proceeds from the Partnership's repayment of the Note back to the Partnership, and that any benefit that the

---

copies of the certified notices mailed to Wolfe and USIG until May of 1998.

Purchasing Partners made on the Note was not "Partnership profit." The court also ruled that $37,500 in settlement proceeds had been improperly paid to Express Development for work to redesign the project concept, and ordered that amount to be credited back to the Partnership. The receiver's motion for reconsideration of the Order was denied.

The court subsequently ordered an accounting. On July 14, 1999, Tim Murphy, CPA, submitted his report and recommendations (the "Murphy Report"). Murphy recommended that the escrowed $60,000, plus the $37,500 credited back to the Partnership as a result of the Order, should be used *inter alia* to pay the remaining debt to the Purchasing Partners on the Note. Because the debt on the Note exceeded the total amount available for distribution, Murphy concluded that there were no Partnership profits, and thus, that there was no "profit" with which to pay the receiver's priority claim. On October 14, 1999, the court ordered distribution of the escrowed funds as recommended in the Murphy Report and entered a final order in accordance with its previous Order. The receiver filed this appeal.

## DISCUSSION

### I.

### Standard Of Review

In an appeal from a bench trial, we "review the case on both the law and the evidence." Md. Rule 8–131(c). If the issue to which appellant excepts, and on which the court ruled, is a purely legal issue, our review is expansive. *See In re Michael G.*, 107 Md.App. 257, 265, 667 A.2d 956 (1995). "The clearly erroneous standard for appellate review ... does not apply to a trial court's determinations of legal questions or conclusions of law based on findings of fact." *See Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990). Because there is no dispute over the trial court's findings of fact in this case, and the issues raised by appellant involve only legal questions, we must determine

whether the trial court was "legally correct." *See id.* at 592, 578 A.2d 1202.

## II.

## Receiver's Rights Under The Charging Order

### A.

### Collection Rights

A charging order is a unique tool. Although it has some characteristics of both an assignment and an attachment, it is neither. *See Bank of Bethesda v. Koch,* 44 Md.App. 350, 354, 408 A.2d 767 (1979). Charging orders originated as a statutory solution to cumbersome common law collection procedures "that were ill-suited for reaching partnership interests." *91st Street Joint Venture v. Goldstein,* 114 Md.App. 561, 567, 691 A.2d 272 (1997) (detailing development of charging orders and relevant case law and commentary). They are purely statutory tools that judgment creditors use to reach partnership interests of indebted partners. *See id.* Indeed, we have characterized a charging order against a limited partnership interest as "nothing more than a legislative means of providing a creditor some means of getting at a debtor's ill-defined interest in a statutory bastard, surnamed 'partnership,' but corporately protecting participants by limiting their liability as are corporate shareholders." *Bank of Bethesda,* 44 Md.App. at 354, 408 A.2d 767.

Charging orders against a limited partnership interest are governed by Title 10 of the Corporations and Associations Article ("CA"), known as the Revised Uniform Limited Partnership Act (RULPA).[5] Under section 10–705, judgment

---

5. RULPA replaced the Uniform Limited Partnership Act (ULPA) in 1982. *See* 1981 Md.Laws, Chap. 801. The predecessor to § 10–705 was § 10-121 (§ 22 of the prior uniform law), which included language authorizing a court to "appoint a receiver, and make all other orders, directions, and inquiries which the circumstances of the case might require." *See Lauer Construction,* 123 Md.App. at 118, 716 A.2d 1096; Md.Code (1975), CA § 10–121(a). This language is similar to language

creditors may obtain a charging order against the partnership interest of either a general or limited partner of a limited partnership. *See Lauer Construction v. Schrift*, 123 Md.App. 112, 116, 716 A.2d 1096, *cert. denied sub nom. Gibson's Lodging v. Lauer*, 352 Md. 310, 721 A.2d 989 (1998).

A charging order gives the charging creditor only limited access to the partnership interest of the indebted partner. Section 10–705 restricts the rights conferred under a charging order against an interest in a limited partnership.

> On application to a court of competent jurisdiction by any judgment creditor of a partner, the court may charge the partnership interest of the partner with payment of the unsatisfied amount of the judgment with interest. **To the extent so charged, the judgment creditor has only the rights of an assignee of the partnership interest**....

CA § 10–705 (emphasis added). Under section 10–702, the rights of an assignee of a limited partnership interest are also explicitly limited by design.

> **An assignment of a partnership interest does not** dissolve a limited partnership or **entitle the assignee to become a partner** or, unless otherwise provided in the partnership agreement, **exercise any rights of a partner.** Unless otherwise provided in the partnership agreement, **an assignment entitles the assignee to receive, to the extent assigned, only the distributions to which the assignor would be entitled.**

CA § 10–702 (emphasis added). An assignee of a limited partnership interest generally cannot become a partner without the consent of all other partners. *See* CA § 10–703(a).

In two recent decisions, this Court has examined limitations on the rights conferred by a charging order against a partnership interest. In *91st Street Joint Venture, supra,* we addressed for the first time the scope of judicial authority to fashion relief under a charging order. *See 91st Street,* 114

---

in the current statute governing rights of a creditor against an interest in a general partnership. *See* CA § 9–505(a), *infra* at n. 6.

Md.App. at 570, 691 A.2d 272. We outlined the two basic methods by which a creditor may proceed to collect from an indebted partner. *See id.* at 572, 691 A.2d 272. The preferred collection method is to use a charging order to divert the debtor partner's right to partnership profits to the judgment creditor. *See id.* " 'If this method is ineffectual there is another more drastic course of action. . . .' " *Id.* (quoting Gose, *The Charging Order Under the Uniform Partnership Act,* 28 Wash.L.Rev. 1, 10 (1953)). That alternative is "the ultimate transfer of the debtor partner's interest. . . ." *Id.* We recognized that the court's powers to appoint a receiver, to order an accounting, and to make other orders as "the circumstances of the case may require" are merely "subsidiary aids to the collecting process," which the court may exercise in its discretion. *Id.* (quoting Gose, *supra*).

Examining cases from other jurisdictions, we held that under section 9–505 of the Revised Uniform Partnership Act,[6] "the ordering of a sale is [also] something that the trial court may do as a supplement to charging the interest of the

---

**6.** Title 9 of the Corporations and Associations Article governs general partnerships. Section 9–505 governs charging orders against a general partnership interest.

*(a) Authority of court.*—On due application to a competent court of any judgment creditor of a partner, the court which entered the judgment, order or decree, or any other court, may charge the interest of the debtor partner with payment of the unsatisfied amount of the judgment debt with interest thereon; and may then or later appoint a receiver of his share of the profits, and of any other due or to fall due to him in respect of the partnership, and make all other orders, directions, accounts and inquiries which the debtor partner might have made, or which the circumstances of the case may require.

§ 9–505(a).

Effective July 1, 1998, section 9–505 replaced former section 9–1205 of the Uniform Partnership Act (UPA) (§ 22 of the prior uniform law), due to the adoption of the Revised Uniform Partnership Act (RUPA). The Charging Order in this case was issued in 1993; therefore, the enforcement mechanisms in former section 9–1205 of the UPA apply to this action. Because there is no relevant difference between current section 9–505 and its predecessor, however, we refer to section 9-505 in our discussion and analysis. *See Lauer Construction,* 123 Md.App. at 115 n. 1, 716 A.2d 1096.

partnership and appointing a receiver for profits," but that "any transfer of the debtor partner's interest is to take place pursuant to the rules governing judicial sales." *Id.* at 577, 691 A.2d 272. Accordingly, we held that a receiver must obtain judicial permission for such a forced transfer of the debtor partner's interest, and that a receiver with a charging order against an interest in a general partnership is not entitled to assign the charged partnership interest without court order or the consent of the remaining partners. *See id.* at 573, 576–78, 691 A.2d 272.

But we also noted in *91st Street* that under section 10–705, the rights of a creditor against a limited partnership interest are "more limited ... than that provided for in the UPA and ULPA" governing general partnerships. *Id.* at 570 n. 2, 691 A.2d 272. The next year, in *Lauer Construction, supra,* we addressed for the first time the nature and extent of those rights. We held that creditors with a charging order against a limited partnership interest are entitled to the same collection remedy as creditors with a charging order against a general partnership interest, with the same limitations. *See Lauer Construction,* 123 Md.App. at 119, 716 A.2d 1096. We based our decision on the absence of explicit enforcement or collection mechanisms in section 10–705 and similarities in the right to receive partnership distributions under both RULPA and RUPA.

But our holdings in both *91st Street* and *Lauer Construction* addressed only the scope of a creditor's "collection remedy," *i.e.,* a creditor's right to "liquidate" the debtor partner's financial interest in the partnership, because that partner's right to partnership distributions "collateralizes" the judgment debt as a result of a charging order. Both cases considered how a creditor could use his unique charging order tool to collect the debt by reaching the indebted partner's financial interest in the partnership. Both cases concluded that these collection rights may be exercised only through the courts, and must be judicially determined on a case by case basis. In examining these judicially supervised collection methods, we were not presented with, and therefore did not address,

whether a creditor also could use the same charging order as a tool to demand information about partnership debt, partnership opportunities, or other partnership affairs, or to participate in the partnership's decisions regarding those matters. In addressing the collection rights of a charging creditor, neither case addressed whether the charging creditor may exercise the management rights of the debtor partner. We address that question now.

## B.

### Management Rights

In this case, the receiver seeks more than the collection rights that we addressed in *91st Street* and *Lauer Construction*. In the trial court, he asserted that by virtue of the Charging Order, he had the same right as USIG and Wolfe to be notified of the opportunity to purchase the Note, and that he was entitled to "stand in the shoes" of Wolfe and USIG to demand that the amount of the loan discount be credited back to the Partnership because the Purchasing Partners did not obtain their consent to the Note purchase. After an evidentiary hearing, the trial court concluded that the receiver "was not entitled to any notice" of the Note purchase or any credit for the difference between the amount that the Purchasing Partners paid for the Note and the amount they received at the December 1997 settlement.

The receiver moved to reconsider, arguing that the real issue was not whether the receiver received notice of the opportunity, but whether the debtor partners had consented to the Note purchase. As authority for his consent argument, he relied on section 9–404, which provides that

[e]very partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

CA § 9–404. At a hearing on the motion to reconsider, counsel for the Partnership responded that the duty of general partners under section 9–404 is to "fully disclose and give the

opportunity to the partners," and that is exactly what the Bellerive general partners had done. The Partnership argued that the partners' fiduciary duty was to disclose and offer the opportunity to the other partners, that section 9–404 does not require "literal consent," and that even if it did, the receiver had no standing to assert the rights of the debtor partners under section 9–404. The trial court issued a second written opinion and order, finding *inter alia* that "the partners discharged their fiduciary duty to Mr. Wolfe and USI[G] by offering [them] the opportunity to join in the purchase of the note." The court also stated that it was "not convinced that [p]laintiff, as receiver, has a right to challenge the purchase of the note . . . ."

On appeal, the receiver renews his notice and consent arguments. Relying on section 9–404 and language in *Rector v. Azzato,* 74 Md.App. 684, 539 A.2d 1162 (1988), and *Leventhal v. Five Seasons Partnership,* 84 Md.App. 603, 581 A.2d 449 (1990), the receiver repeatedly asserts that he was entitled to notice of the purchase and to assert the debtor partners' rights under section 9–404, because the Charging Order placed him "in the shoes of the debtor" and entitled him "to do that which the debtor/partner could have done." *See Leventhal,* 84 Md.App. at 606, 581 A.2d 449.

The receiver's reliance on this language is misplaced. Neither *Rector* nor *Leventhal* defined the nature and scope of the charging creditor's rights so broadly. Neither case held that a receiver with a charging order against limited partnership interests stands in the debtor partners' shoes for all purposes. Neither case involved the debtor partner's right to receive information about limited partnership opportunities, or to participate in limited partnership affairs. In fact, neither case involved a partnership opportunity, and *Leventhal* did not even involve a limited partnership. *Cf. Rector, supra* (judgment creditor of assignee of limited partnership interest may obtain charging order against that interest); *Leventhal, supra* (receiver with charging order against interests in general partnership may petition for dissolution of general partnership).

Like the trial court, we reject the receiver's "substituted shoes" argument, because it is contrary to unambiguous statutory limitations on a charging order against a limited partnership interest and to sound principles of limited partnership law. Distilled to its essence, the receiver's argument is that the Charging Order operated as either a judicial assignment of the debtor partners' management rights in the Partnership, or as a judicial substitution of the receiver for the debtor partners for all purposes. We decline the receiver's request to expand the rights conferred by a charging order beyond the collection rights we discussed in *Lauer Construction* to include the management rights of a debtor partner.

■ As reflected in the unambiguous language of sections 10–702, 10–703, and 10–705, a charging order against a limited partnership interest does not operate as an unlimited assignment of all partnership rights, or as a judicial "swap" of the creditor for the debtor partner. When read *in pari materia,* these sections make it clear that a charging order against a limited partnership interest does not entitle the creditor *"to become a partner, or . . . exercise any rights of a partner."* § 10–702 (emphasis added). The "rights of a partner" include the right to information and the right to participate in partnership decisions that the receiver is demanding in this instance. These rights are not analogous to "distribution" or "collection" rights, nor are they merely incidental or ancillary to the receiver's right to receive the debtor partner's distributions. Instead, we conclude that these rights are fundamental "management rights of a partner" that were not transferred to the receiver by the Charging Order. We explain.

■■ The Charging Order in this case covered the limited partnership interests of both a general partner (USIG) and a limited partner (Wolfe). The Partnership Agreement reflected the characteristic management relationship between general and limited partners. It provided that the three general partners "ha[d] full power and authority to manage the business, property and affairs of the Partnership," and that they would "keep all partners reasonably informed, upon their request, as to the business of the Partnership . . . ." The

Agreement, however, also prohibited the limited partners from voting on or participating in "major decisions." It specifically provided that no " 'Major Decisions' ... will be made, taken or implemented by the general partners ... without the prior concurrence of **two-thirds of the general partners**...." (Emphasis added). All matters relating to the Partnership's debt were defined as "Major Decisions." Thus, in the context of this dispute, USIG, as one of Bellerive's three general partners, had the right to request information about Partnership debt and opportunities, and a right to participate in making decisions regarding those matters as a minority of the three general partners. As a limited partner, Wolfe had only the right to request information.[7] The question raised by the receiver is whether the Charging Order entitled him to exercise any of those rights.

 We agree with the trial court's conclusion that the receiver had no right to demand or receive notice of the opportunity to purchase the Note. Under RULPA, among those "rights of a partner" that may not be exercised by a creditor with a charging order against a limited partnership interest is the right to demand and receive information about partnership transactions.[8] Our construction of RULPA is based on language in its statutory predecessor. *See* Md.Code (1975), § 10–118 of the Corporations and Associations Article;

---

7. Limited partners "have no right to participate in the management of the business...." *Klein v. Weiss,* 284 Md. 36, 52, 395 A.2d 126 (1978). "Limited partner participation in management is inconsistent with the structure of limited partnerships which are designed for general partners to be active managers and limited partners to be·passive investors." IV A. Bromberg & L. Ribstein, *Bromberg & Ribstein on Partnership,* § 16.03(b), at 16:39 (1988, 2000 Cum.Supp.). Limited partners generally do have rights to demand and receive information about the partnership's business. *See* § 10–305(a) (right to information regarding state of the business, financial condition, such information regarding the "affairs of the limited partnership as is just and reasonable for any purpose reasonably related to the limited partner's interest as a limited partner").

8. Of course, we recognize that a partnership agreement may "otherwise provide" for assignment of such management rights. *See* § 10–702. In this case, the Partnership Agreement did not.

ULPA § 19. The RULPA drafters' official comment to section 10–702 states that the language prohibiting transferees from "exercis[ing] the rights of a partner" is derived from the following sentence in ULPA: "An assignee who does not become a substituted limited partner has *no right to require any information or account of the partnership transactions* . . . ." § 10–118, *supra* (emphasis added); *see* ULPA § 19 (official comment). Information regarding partnership transactions includes information regarding partnership property and partnership opportunities.[9] Because the receiver had only the rights of an assignee, and such rights do not include the right to demand or receive information regarding partnership opportunities, the trial court was legally correct in ruling that the receiver was not entitled to separate notice of the opportunity to purchase the Note.

We also conclude that the receiver had no standing to assert any right that the debtor partners may have had to consent to or challenge the Note purchase under section 9–404.[10] We think that, like rights to obtain partnership information, rights under section 9–404 are fundamental "rights of a partner" that are not transferred to a creditor by a charging

---

9. "Information belongs to a partnership in the sense of property in which it has a valuable right, if it is of the character which might be employed to the partnership's advantage." *Fouchek v. Janicek*, 190 Or. 251, 225 P.2d 783, 791 (1950). Under established principles of partnership law, partnership property belongs to the partnership, and not to the individual partners. *See Provident Bank v. DeChiaro Ltd. Partnership*, 98 Md.App. 596, 606–07, 634 A.2d 973 (1993), *cert. denied*, 334 Md. 210, 638 A.2d 752 (1994). Included in the parameters of "partnership property" is the right to take advantage of opportunities that may benefit the partnership, and information relating to such opportunities. For this reason, "[w]hen a partner learns of, or is offered, any opportunity which is within the scope of the partnership's business, the partner may not pursue the opportunity for his or her personal benefit without first offering it to the partnership." J. William Callison, *Partnership Law and Practice*, § 12.08, at 12–19 (Clark Boardman Callaghan 1996).

10. Thus, we do not decide whether the trial court was legally correct in deciding that there was no breach of fiduciary duty to the debtor partners, or whether the notice and opportunity to participate in purchasing the Note that were given to the debtor partners were sufficient to satisfy the "consent" requirement of section 9–404. It is

order. Under sections 10–702 and 10–705, partners whose partnership interests have been assigned or charged remain partners and may continue to exercise their rights as a partner. Prohibiting a third party creditor from exercising the debtor partner's management rights reflects the fundamental principle that

partners should be able to choose their associates. The principle is not violated by the transfer of purely financial rights through the assignment of a partner's interest in the partnership, but it would be violated by the admission of a new speaking and voting member into the closely knit arrangement that typifies the ... partnership.

*Bromberg and Ribstein, supra,* § 3.05(c)(3)(vi)(4), at 3:86.

In the context of a proposal to purchase partnership debt, the right to consent under section 9–404 is essentially a right

---

an unresolved question whether section 9–404 requires the unanimous consent of all partners or can be established by acquiescence. *See generally Bromberg & Ribstein, supra,* § 6.07(d) n. 83, at 6:137 ("it is not clear that a disclosure alone, in the absence of consent or acquiescence by the other partner, is sufficient to exonerate the usurping partner."); *id.,* § 16.07(h)(1), at 16:133 ("[c]onsent can be implied from an informed refusal by the partnership to engage in the transaction [constituting the partnership opportunity] or a clear course of conduct indicating acquiescence in the profit"); *Callison, supra,* § 12.08, at 12–19 ("[a] partner may take personal advantage of a partnership opportunity, even when the opportunity is within the full scope of the partnership business, when the co-partners have full knowledge of the opportunity and either acquiesce to the partner's action or reject the opportunity"); *id.* at § 12.13, at 12–28 ("[w]aiver or ratification ... may be implied by silence or failure to act after the nonbreaching partners learn of the breach"). A rule that acquiescence, waiver, or ratification is sufficient would be consistent with analogous rules governing corporate opportunities. *See, e.g., Impala Platinum, Ltd. v. Impala Sales (USA),* 283 Md. 296, 324, 389 A.2d 887 (1978) (fiduciary duty is "to make full disclosure of all known information"); *Maryland Metals v. Metzner,* 282 Md. 31, 46–47, 382 A.2d 564 (1978) (shareholder may pursue corporate opportunity when corporation makes clear its lack of interest or abandons previously expressed interest). Contrary to the Partnership's contention, we have not resolved this question in the partnership opportunity context. *See Dixon v. Trinity Joint Venture,* 49 Md.App. 379, 431 A.2d 1364 (1981) (holding that general partners must notify limited partners of partnership opportunity to purchase adjacent property, but not addressing whether § 9–404 requires affirmative consent of partners after such notice).

to participate in the decision regarding whether the partnership should commit its resources to pursue the partnership opportunity. Like the right to information about partnership opportunities, a partner's right to consent to another partner's pursuit of a partnership opportunity is a management right of a partner that remains with the indebted partner after his right to receive distributions in the limited partnership has been transferred via a charging order. Here, the debtor partners neither objected to the Note purchase nor sought to assert rights under section 9–404.

We recognize the heightened fairness concerns when the partnership opportunity at issue is the purchase of the partnership's debt,[11] and that decisions regarding the partnership's debt may have a substantial impact on the financial interests of all partners. But we decline to create an exception to section 10–702 and 10–705 that would allow a receiver with a charging order to assert the rights of the indebted partner under section 9–404 in matters involving information and decisions about the Partnership's debt and about opportunities and plans to purchase that debt. We are not free to simply ignore that RULPA prohibits a charging creditor from exercising such fundamental rights of a partner. Adopting exceptions for partnership debt or partnership opportunity cases would be nothing less than judicially amending the language of sections 10–702, 10–703, and 10–705. We decline to do so.

Even if we could create a partnership debt/partnership opportunity exception for charging orders, we would not, because such an exception would "swallow the rule" and undermine the important purpose of RULPA's limitation on the rights conferred by a charging order. Indeed, it could be argued that most management decisions involve a "partnership opportunity" of one sort or another. Similarly, most

---

11. *See, e.g., Thomas v. Schmelzer,* 118 Idaho 353, 796 P.2d 1026, 1032 (App.1990) (partner breached fiduciary duty by undisclosed purchase of partnership's secured debt during negotiations over winding up of partnership); *Ebest v. Bruce,* 734 S.W.2d 915, 922 (Mo.App.1987) (partners breached fiduciary duty by undisclosed purchase of partnership's secured debt at substantial discount).

management decisions have the potential to affect the partnership's debt. Thus, a "partnership debt/partnership opportunity" exception would be difficult to interpret, enforce, and limit. By expanding the rights conferred by a charging order beyond the judicially supervised collection rights of a creditor that we have addressed in our previous decisions, we would defeat one of the primary purposes and benefits of having a uniform limited partnership act—to provide the clarity, predictability, and certainty that facilitate limited partnership investment and business.

Instead, restricting the rights conferred by a charging order under section 10–705 promotes the general purpose of limited partnership acts, which is not primarily to protect or assist creditors, but to encourage investing by enabling limited partners to invest money and to share in the profits, but without risking more than the amount they contributed. *See Gilman Paint & Varnish Co. v. Legum,* 197 Md. 665, 670, 80 A.2d 906 (1951); *Klein,* 284 Md. at 51, 395 A.2d 126. In *Lauer Construction, supra,* we explicitly recognized that limiting a creditor's rights under a charging order "protect[s] the partnership business and prevent[s] the disruption that would result if creditors of a partner executed directly on partnership assets." *Lauer Construction,* 123 Md.App. at 115, 716 A.2d 1096. By limiting a creditor's right to exercise the debtor partner's management rights, we ensure that creditors of a limited partner cannot disrupt partnership business or interfere with the management rights of other partners. In particular, this limitation prevents third party creditors from using a charging order as a license to "squeeze" other limited partners into paying off obligations of the debtor partner, as the necessary cost of eliminating the risk of such interference.

These reasons for excluding third party creditors from a seat at the partnership's management table are no less applicable—and perhaps are even more applicable—when the issue under consideration is what to do about partnership debt or about a partnership opportunity. If a charging creditor is permitted to exercise management rights of the debtor partners in matters pertaining to partnership debt or partnership

opportunities, that third party creditor is in an enhanced position to wield any of the debtor partner's management rights as a tool to obtain payment of the judgment debt. Undoubtedly, investors contemplating a limited partnership opportunity would be discouraged by the possibility of having to satisfy or deal with creditors of each partner.

The receiver complains that the general partners failed to make a capital call, and that they were obligated to do so when the Partnership had insufficient funds to make the mortgage payments. We are not convinced that the provision of the Partnership Agreement cited by the receiver mandates a capital call. The Partnership Agreement allows the general partners to "lend to the partnership" any amount required for "additional funds for partnership purposes," and to "charge interest therefore at such rate of interest as the general partners may from time to time determine." The Agreement also provides that "if the general partners do not elect to lend such funds to the Partnership, or to borrow such funds, . . . all as determined by the affirmative vote of two-thirds (⅔) of the general partners . . . the Managing Partner shall call upon all of the partners (general and limited) to invest proportionately. . . ." Thus, it is clear that the general partners could choose to lend to the partnership themselves, rather than make a capital call on all the partners.

In this context, we do not see a difference between lending directly, and purchasing an outstanding loan made by a third party. Not only did the general partners have authority under the Partnership Agreement to assume the Loan, but their decision to do so benefitted the Partnership. The purpose of the purchase was to avoid the scheduled foreclosure of the Partnership's sole asset, and the Note purchase "bought time" for the Partnership to obtain a return on its investment by having the Purchasing Partners hold the Partnership's debt and assume all risk of nonpayment for a period of more than three years.

We have also considered the receiver's argument that the Purchasing Partners knew about the receiver and the Charg-

ing Order before they sent notice of the purchase opportunity, knew that the receiver had asked for information regarding Partnership developments, and knew that the notices sent to the debtor partners had been returned. None of these factors changes our analysis or our decision. The fact is that the receiver held only a charging order against limited partnership interests, and not a full partnership interest with its concomitant management rights. As RULPA and the Partnership Agreement make clear, if the receiver wished to become a substituted partner, he was obligated to apply for and obtain the consent of all other partners. *See* § 10–703. There is no evidence that he even attempted to do so. Moreover, the receiver seems to forget that a charging order does not prevent indebted partners from participating in partnership affairs, at least to the extent an applicable partnership agreement allows. Nor does it prohibit the indebted partner from keeping the charging creditor informed about partnership affairs.[12]

We do not think that the receiver or judgment creditors are burdened unfairly by the denial of these management rights. Like other well-informed creditors, they presumably knew that partnership interests are notoriously poor security for the repayment of a debt. "Credit extenders who look to a partner's interest in a partnership as a possible source of satisfaction are well advised to take and perfect a security interest rather than rely on a charging order ... [because a] partner-

---

12. Notice of the purchase opportunity was sent via certified mail to the debtor partners at the address they last designated for Partnership correspondence, in accordance with the Partnership Agreement and applicable law. *See* CA § 9–102(b) (person has "notice" when written statement of fact is mailed to such person at business or residence). Each partner agreed in the Partnership Agreement that all notices relating to the Partnership should be sent to the address designated by that partner. It is a simple task to change a partner's designated correspondence address. The evidence showed that, in this case, the addresses for the debtor partners were no longer current, and that no substitute address had been designated for them. The receiver was free to request that the debtor partners designate him to receive Partnership correspondence, or otherwise to request copies of Partnership correspondence from the debtor partners.

ship interest is not very good collateral...." IV *Bromberg and Ribstein, supra,* at § 13.07(a), at 13:43. Simply stated, lenders should not rely on a charging order as a *post hoc* substitute for other forms of security that might have been available at the time credit was extended.

### CONCLUSION

The trial court was legally correct in ruling that the receiver had no right to notice of the opportunity to purchase the Loan. The receiver had no standing to assert any right that the debtor partners may have had to challenge the Note purchase under section 9–404. As a result of our holding regarding the receiver's limited rights and standing under the Charging Order, we will not address the receiver's derivative contentions of error regarding the escrowed funds, the interest rate, and the trial court's adoption of the Murphy Report, except to affirm that distribution of the escrowed funds, as recommended in the Murphy Report and approved by the trial court, may proceed.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**